JOHN TORRENT ET AL. v. COMMON COUNCIL OF THE CITY OF MUSKEGON ET AL.

*Injunction to restrain expenditures by municipal council for public buildings.*

A bill will not lie to restrain the common council of a municipal corporation from putting up suitable public buildings for the purposes of city officers if the provisions of the charter do not prevent it.

The citizens of a municipality cannot confer upon the common council functions not left with them by the charter.

Courts cannot interfere with the discretion of municipal bodies in the expenditure of public funds unless it has been plainly abused and practically exceeded under pretence of keeping within their charter powers.

City charters must be rationally construed as intended to create corporations which shall resemble in their essential character the class into which they are introduced.

The Constitution of Michigan contemplates that the Legislature shall create cities and other municipalities with full powers of beneficial legislation; and when the Legislature prescribes the limit of financial action it must be assumed to permit all reasonable and proper expenditures within those limits.

Interference by injunction should not be allowed where the delay may work great damage, without making full provision for redress by an adequate injunction bond.

Appeal from Muskegon. Submitted October 13. Decided October 19.

BILL to enjoin the execution of a contract for building a city hall. Defendants appeal. Reversed; bill dismissed.

*Henry H. Holt* and *Smith, Nims, Hoyt & Erwin* for complainants, cited, in support of the right of suit: *Curtenius v. Hoyt* 37 Mich. 583; High on Injunctions § 804; Cooley on Taxation 548; 2 Dill. Mun. Corp. (2d ed.) § 731.

City Attorney *Andrew B. Allen, James H. Campbell* and *M. Brown* for defendants.

CAMPBELL, J. Complainants, who are considerable tax-payers, obtained from the circuit court for the county of Muskegon, a decree restraining the city from putting up a building for the purposes of city offices and of the fire department. The claim of complainants, which seems to have been adopted by the court below, is that the building is more expensive than would be needed by the fire department, and that no power is given by the charter to build a city hall; and further that it could not be lawful to undertake such a large expenditure without the assent of the citizens by vote for that purpose.

If there is no power to build a city hall, or an edifice intended to subserve similar purposes, there is no power in the citizens to increase the functions of the council. Our attention has not been called to any provision in the city charter, authorizing any financial question to be submitted to the electors, except that of issuing bonds. Charter, §§ 66–67. That ground becomes wholly immaterial, and the question for us to determine is whether the facts of the case bring it within any rule to be drawn from the charter, allowing or forbidding the action in dispute.

The contract in question was made on the 17th of August of this year, and provides for a building for the use of the fire department, and for city offices, to be finished March 15, 1882. The cost is to be $15,371, payable in monthly instalments. It involved the destruction and removal of a smaller engine-house already on the lot. The bill relies largely on the fact that the city will not have funds to pay it, and will thus be brought in debt.

This last consideration, standing alone, would not be one which we can properly pay much attention to. It is pro-

vided by the charter that the city may raise annually for its
general purposes not more than seven per cent. on the property
assessable; which at present rates would be about one hun-
dred thousand dollars. The contingent fund which receives
this money, is also entitled to the liquor taxes, and some
other receipts, said to be not far from $10,000 a year. This
tax levy is under the discretion of the common council. It
appears clearly enough that at the present rates of expendi-
ture for public purposes, the city may, if it chooses, raise
money enough to pay for this expenditure, and that there
is no controlling financial reason against it, if lawful.

But in saying this, we do not assume that it belongs to
this court or any other, to dictate to the city how it shall
spend its money. The council must use its own discretion
where it will save and where it will spend; and the case
must be a very clear one, and the subterfuge very plain,
before that discretion can be regarded as having been
exceeded so as to show an excess of power under a pretence
of keeping within it. It is not the business of courts to act
as city regulators, and unless the authority of the representa-
tives of the citizens has been exceeded, their action cannot
be interfered with merely because it may not seem to other
persons to be as wise as it might be. We shall therefore
confine ourselves to the question of power, merely adding,
in view of the large range of the argument, that there is, in
our opinion, nothing which indicates the slightest miscon-
duct in the council, if they acted within their powers.

There is nothing said in the charter about any such build-
ing, by name, as a city hall, or city offices. There is power
given expressly to build and maintain water-works, hospitals,
markets, and cemeteries. §§ 43, 91. Full power is given
concerning a fire department. §§ 95 *et seq.* The council is
authorized to take as well as to contract for private property,
for—among other things—public grounds, parks, market
places,—land necessary for public buildings and cemeteries.
§ 119 as amended in 1879, Local Acts, p. 201.

It is to be noticed in this connection, that prior to 1879,
this section mentioned lands "for necessary public build-

ings," which in 1879 was changed to "land necessary for public buildings." This change is somewhat significant, as bearing on the discretion of the council.

The enumeration of most of these subjects enables us to see that the city of Muskegon has been empowered to do several important and expensive things, which are often left to private enterprise, and several others which cannot be said to be necessary in any absolute sense. The framers of the charter evidently thought that some respect was due to humanity, and to the necessities of civilized life, as understood by enlightened communities.

If cities were new inventions, it might with some plausibility be claimed that the terms of their charters, as expressed, must be the literal and precise limits of their powers. But cities and kindred municipalities are the oldest of all existing forms of government, and every city charter must be rationally construed as intended to create a corporation which shall resemble in its essential character the class into which it is introduced. There are many flourishing cities whose charters are very short and simple documents. Our verbose charters, except in the limitations they impose upon municipal action, are not as judiciously framed as they might be, and create mischief by their prolixity. But if we should assume that there is nothing left to implication, we should find the longest of them too imperfect to make city action possible.

We have had occasion several times to refer to the historical character of municipal institutions, and to the duty of courts to read all laws and charters in that light. Among other cases illustrating this necessity, we may refer to *People v. Hurlbut* 24 Mich. 44; *Attorney General v. Lothrop* 24 Mich. 235; *Stuart v. School District No. 1 in Kalamazoo* 30 Mich. 69; *Attorney General v. Burrell* 31 Mich. 25.

If we examine into the usages of municipal bodies from the earliest times, we shall generally and almost universally find that in all cities and boroughs there have been from the beginning public buildings known as guild, town, or city halls, or by some equivalent name, devoted to none but municipal purposes. In those buildings the local courts and

councils meet, and the documents are preserved, and the municipal business of all kinds is conducted. From the early settlement of this country the same usages have prevailed, and in many of the old towns of New England the municipal building has always been preserved and maintained. The power to erect such buildings has seldom if ever been questioned in that part of the country, and it has frequently been referred to as an illustration of what may be regarded as public necessities. In *Stetson v. Kempton* 13 Mass. 272, it was used for that purpose, to distinguish such powers from others. After referring to the meaning of the word "necessary" for municipal purposes, some instances are given which, the court say, "are necessary charges, because the effect of a legal discharge of their corporate duty. The erection of public buildings for the accommodation of the inhabitants, such as town houses to assemble in, and market houses for the sale of provisions, may also be a proper town charge, and may come within the fair meaning of the term *necessary*, for these may be essential to the comfort and convenience of the citizens. This case has been referred to since as setting forth the true doctrine on this particular subject. In *Willard v. Newburyport* 12 Pick. 227, it was cited to sustain the legality of maintaining a town clock. In *Spaulding v. Lowell* 23 Pick. 71, it was also referred to as sanctioning the building of market houses, in the silence of the charter on the subject. This last case is the more significant as Lowell had already a town hall, and the market house was built with rooms for a court, and some other public purposes. It was held to come within the power to expend money for *necessary charges,*—the necessity being determined by fair municipal discretion. So also in *French v. Quincy* 3 Allen 9, it was held a town hall might be lawfully built with a view to future wants, and the use of portions not of present necessity might be made for other purposes, without violating a condition in the grant of the property that it should not be used for any other purpose than a town house. A

somewhat similar view of the general doctrine is found in *Ketchum v. Buffalo* 14 N. Y. 356.

The decision of this court in *Attorney General v. Burrell* 31 Mich. 25, maintaining the power of a town to buy land for a common, contains a discussion bearing on the same subject. We need not multiply authorities on the matter.

The Constitution of this State, as has been pointed out in some of the decisions referred to, contemplates that the Legislature shall create cities and other municipalities with full powers of beneficial legislation. The checks on extravagance are therein prescribed as to be found in limiting their powers of taxation and borrowing money, or incurring debts. Art. 15, § 13. When the Legislature of the State prescribes the limits of financial action, it must be assumed to permit all reasonable and proper expenditures within those limits. Charters are, or at any rate should be, passed with a view to a long and growing progress.

If any reasons were necessary beyond ancient and general usage, they might be found in the manifest propriety of furnishing cities with official buildings of their own. They must either own or rent them, and it is not desirable to have the public convenience too much subjected to the chances of private action. If there were no other danger than that of inconvenience from unsuitable quarters, that alone is a serious mischief. But experience has shown that there is no security for public records where they are not kept by themselves in a safe and permanent repository. Loss by pillage or destruction, or by carelessness or forgetfulness, is of so common occurrence as to make the records of many of our communities very imperfect. And most cities and towns that have any pride in preserving the records of their past history find it an advantage in many ways to have permanent buildings with which their history is visibly connected.

We have not deemed it necessary to consider the questions bearing on the right of these complainants to vindicate public grievances. The experiment is ill judged on its merits. We also feel it our duty to refer to the danger of interfering in the outset of a case by injunction, with inter-

ests where delay may work great damage, without making full provision for redress by an adequate injunction bond. Defendants ought not to be subjected by the machinery of the law to irreparable mischief.

The decree should be reversed, and the bill dismissed, with costs of both courts.

The other Justices concurred.