WOLGAMOOD *v.* VILLAGE OF CONSTANTINE.

1. MUNICIPAL CORPORATIONS—ELECTRIC LIGHT PLANTS—VILLAGES—RATES.

Municipal electric light plants may be acquired, constructed, owned and operated by villages, the village council having the power to fix such just and equitable rates as may be deemed advisable for supplying the inhabitants of the village with lights (Const. 1908, art. 8, § 23; 1 Comp. Laws 1929, § § 1684, 1689, 1692).

2. SAME—OPERATION OF A PUBLIC UTILITY A PROPRIETARY ACTIVITY.

A municipality's operation of a public utility, although it may be a proprietary activity, constitutes engaging in a public enterprise for a public purpose.

3. SAME—DISCRETION OF OFFICERS—COURTS.

Courts will not interfere with the discretionary acts of officers of a municipality having power to engage in an activity for a public purpose.

4. SAME—DISCRETION OF OFFICERS—JUDICIAL INTERFERENCE.

To warrant interposition of court of equity in municipal affairs there must be a malicious intent, capricious action or corrupt conduct, or something which shows the action of officers complained of did not arise from an exercise of judgment and discretion vested by law in them.

5. SAME—DISCRETION OF OFFICERS—ABUSE OF DISCRETION—COURTS.

Courts cannot stand between the public and their regularly elected authorities unless the latter exceed their powers and, so long as they do not, the people must bear the consequences of their folly or choose wiser representatives, the discretion necessarily vested in a public functionary not being reviewable.

6. CONTEMPT—MUNICIPAL OFFICERS—DISCRETION OF OFFICERS—FRAUD.

A village and its officers would not be guilty of contempt of court for failure to comply with terms of decree as to rates because of good-faith errors in judgment or discretion in connection with their operation and management of the municipally-owned electric light plant but would be guilty of contempt only in case of fraud, dishonesty, or abuse of discretion in their official duties (1 Comp. Laws 1929, § § 1684, 1689, 1692).

7. SAME—MUNICIPAL OFFICERS—POWER RATES—COST OF PRODUCTION—DISCRIMINATION.

In proceeding to hold defendant village and its officers guilty of contempt of court for violation of terms of decree requiring them to charge sufficient rates for retirement of bonded indebtedness, for operating, maintenance and repair expenses, and to build up a reserve for depreciation on municipally-owned electric light plant, record supported finding of trial court that power rates charged were more than the cost of production, were not discriminatory, and did not violate the terms of the decree (1 Comp. Laws 1929, § § 1684, 1689, 1692).

8. SAME—STREET LIGHTING CHARGE—COST—INCREASE OF SERVICE.

In proceeding to hold village and its officers in contempt of court for violation of terms of decree relative to rates charged for service by municipally-owned electric light plant, finding of trial court that defendants were not guilty of contempt because they increased charge to village for street lighting was supported by record showing a greater cost for furnishing such service than other types of service, and that village general fund was not unlawfully invaded in view of increased amount of service rendered (1 Comp. Laws 1929, § § 1684, 1689, 1692).

9. SAME—MUNICIPAL LIGHT PLANT—NOTICES TO CUSTOMERS—RATES.

Under decree in suit relative to rates to be charged by municipally-owned electric light plant providing that defendant village and its officers were enjoined from directly or indirectly publishing any advertisements or statements relative to the financial condition of the light plant that were misleading or did not state the whole truth, and ordering defendants to charge sufficient to retire bonded indebtedness, pay operating, maintenance and repair expenses and build up a reserve for depreciation, subsequent mailing of notices to customers which stated that residential rates and commercial rates were to remain the same did not constitute a contempt where there was a change in the power rate and the charge for street lighting (1 Comp. Laws 1929, § § 1684, 1689, 1692).

10. PUBLIC SERVICE—PRIVATE UTILITIES—RATES—INCOME ON INVESTMENT—RESERVE FOR REPLACEMENT.

A privately-owned utility is created and operated primarily for the purpose of profit for the shareholders, is expected to earn a return on the investment therein, pay its indebtedness and keep the corpus of the investment intact by building up a reserve for depreciation equaling the replacement cost and public regulatory bodies permit such utilities to charge rates permitting a return of income and reserve for replacement.

11. MUNICIPAL CORPORATIONS—PUBLIC UTILITIES—DEPRECIATION—REPLACEMENT.

A municipally-owned utility is built and operated for the purpose of providing utility services at a reasonable cost to the citizens of the municipality and charges therefor do not need to include an amount which, in addition to other necessary disbursements, would build up a reserve for depreciation sufficient to equal the replacement cost of the plant and system, in the absence of statutory or other requirement that replacement cost be included.

12. APPEAL AND ERROR—CONTEMPT—MUNICIPAL OFFICIALS—PUBLIC UTILITY RATES.

On review of trial court's order holding village and .its officials not in contempt of court in matter of fixing rates for services rendered by municipally-owned electric light plant pursuant to original decree, Supreme Court does not pass on wisdom or judgment of rates in question but, upon affirming decree, merely determines that record does not disclose fraud, dishonesty, abuse of discretion or violation of public duty by defendants nor acts of commission or 'omission for which they should be adjudged guilty of contempt.

13. EQUITY—JURISDICTION—CONTEMPT—MODIFICATION OF DECREE.

Trial court which had rendered a decree requiring defendant village and its officers to fix rates for service rendered by municipally-owned electric light 'plant sufficient to retire bonded indebtedness thereon, for operating, maintenance and repair expenses and to build up a reserve for depreciation and containing certain injunctive provisions, had jurisdiction to enter decree in second contempt proceedings to enforce decree though such subsequent decree might result in some modification of a prior decree holding defendants in contempt for violation of original decree.

Appeal from St. Joseph; Hatch (Blaine W.), J., presiding. Submitted April 7, 1942. (Calendar No. 41,891.) Decided July 1, 1942.

Bill by Gene G. Wolgamood and others against Village of Constantine and others to enjoin the borrowing of money for construction of an electric light plant or misusing municipal funds, for an accounting and other relief. On petition of plaintiff Wolgamood for an order to show cause why defendants should not be punished for contempt of court for violation of decree entered. Petition dismissed. Plaintiffs appeal. Affirmed.

*Howard, Howard & Howard,* for plaintiffs.

*C. L. Stickler,* for defendants.

STARR, J. Plaintiffs appeal from a decree entered November 1, 1941, dismissing their petition to have

defendants adjudged guilty of contempt for violation of decree dated January 25, 1941, and entered January 27, 1941.

In 1936 the electors of the village of Constantine, at a special election called for that purpose, voted to issue revenue bonds in the amount of $107,000 for the purpose of constructing a municipally-owned electric light plant and distribution system. The trust mortgage securing such bond issue, executed by the defendant village to the Union Guardian Trust Company, provided, in part:

"The general credit of the village shall not be pledged for any payment required under this mortgage or the bonds, but any such payment shall be made from, and to the extent of, the revenues of the plant and system. * * *

"Rates: The village shall charge and maintain rates for electricity furnished by said plant and system, sufficient to provide for full and prompt payment of principal and interest on said bonds, to pay all expenses of operation and of the maintenance of said plant and system in good repair and working order, and to build up *a reserve for depreciation thereof.* * * *

"Surplus Revenue: Any surplus revenue after providing for the operation and maintenance and bond and interest redemption funds shall be used to set up a reserve to meet any deficiencies in the operation and maintenance fund, and *to establish and maintain a reserve for depreciation;* and at the end of each fiscal year such amounts as the village council *shall deem necessary* shall be set apart and placed in said funds. Any surplus remaining after providing for such funds may be used for extensions and improvements of said plant and system or for the purchase and retirement of bonds."

Such bonds were sold and the proceeds used for the construction of the light plant and distribution

system. In 1939 the village council authorized an additional issue of revenue bonds in the amount of $38,000 and obtained a grant of about $26,000 from the public works administration for the purpose of extending and enlarging the light plant and system. Such additional bonds were on equal rating with the first issue and were secured by supplemental trust mortgage to the Union Guardian Trust Company.

In March, 1939, prior to the issue of the additional $38,000 of bonds, plaintiffs, as taxpayers of the defendant village, filed bill of complaint and later amended bill of complaint alleging, among other things, diversion of the general funds of the village; that the sale of the first issue of bonds was unlawful; that losses in the operation of the plant were hidden by the device of increasing accounts payable; that the published rates for current were not collected; that there was unlawful discrimination in rates charged customers; that the proposed additional issue of bonds would be unlawful; and that a part of the proceeds of such bonds would be used to cover losses in operation. Defendants answered and moved to dismiss the amended bill of complaint. Upon a hearing on defendants' motion the court dismissed plaintiffs' amended bill. Plaintiffs then appealed, and in our decision in that case (*Wolgamood* v. *Village of Constantine,* 292 Mich. 222, 226) we stated:

"In deciding this case we have in mind that the cause was not heard on its merits; and that upon a motion to dismiss, the allegations stated in the bill are to be taken as true.  *  *  *  It therefore becomes necessary to analyze the claims of plaintiffs as stated in their amended bill of complaint.  *  *  *

"In our opinion plaintiffs' bill of complaint contains charges which, if true, would entitle a court

of chancery to grant relief. They are entitled to have these charges heard.

"The order of the trial court (dismissing plaintiffs' bill) is reversed."

The case was then tried upon its merits. The trial court determined, among other things, that the bond issues were lawful and valid; that defendant village was guilty of unlawful discrimination in its rates for electric current; that the rates charged for current were "far below the amount required to take care of the cost of generation, distribution, bonds and interest and depreciation," and that an advertisement published by defendants did not correctly and accurately show the actual financial condition of the electric light plant as of May 31, 1940. In pursuance of the trial court's opinion a decree dated January 25, 1941, was entered, providing, in part:

"(1) That the defendants be and they are hereby enjoined from directly or indirectly publishing any advertisements or statements relative to the financial condition of the defendants' electric plant that are misleading and do not state the whole truth.

"(2) That the defendants are ordered to charge and maintain rates for electricity furnished by the Constantine electric plant sufficient to provide for full and prompt payment of principal and interest on the bonds referred to in the bill of complaint, and to pay all expenses of operation and of maintenance of said plant and system in good repair and working order, and *to build up a reserve for depreciation of said plant*, and the defendants are hereby enjoined from charging and maintaining rates not sufficient for the purpose in this paragraph stated.

"(3) That the defendant, Village of Constantine, is hereby restrained from discriminating among its customers.

"(4) That the defendants are enjoined from us-

ing any device whatsoever to collect a rate less than the established rate.''

In pursuance of such decree an injunction was issued against defendants. No appeal was taken from the decree.

In April, 1941, the court, after a hearing on an order to show cause, determined that defendants were guilty of contempt of court for violation of the provisions of the above-quoted decree of January 25, 1941. Such order stated, in part:

''The court does hereby find that the defendant village is guilty of contempt of court in that it did violate paragraphs (2) and (4) of the decree (above quoted) * * * and it is the judgment of the court that it should be punished therefor and that the punishment be and the same is hereby fixed as a fine of $200, provided, however, the payment of said fine is suspended for a period of 30 days, and if said village at the next billing of the customers of its municipal lighting plant sends out its bills in accordance with said decree and injunction and as herein later specified, then said village shall not be required to pay said fine, but otherwise the fine shall be paid 30 days from and after the date of this order.

''It is further ordered, adjudged and decreed that in all other respects the decree (of January 25, 1941) heretofore entered and the injunction issued thereon shall remain in full force and effect.''

On July 15, 1941, plaintiffs again petitioned that defendants be required to appear and show cause why they should not be adjudged guilty of contempt of court for violation of the decree of January 25, 1941. Such petition alleged, in part:

''That * * * for the purpose of defeating the decree, injunction and order, the defendants have continued to sell electricity to the Constantine Creamery Company at less than cost. That at the

hearing April 9, 1941, the defendants were then charging the creamery company for power $.0215 per k. w. h. That thereafter there was a slight increase to $.0224 made in the rate to the creamery company, which was only 9/10 of one mill increase, and on the amount of power used would amount to not over $15 per month, or $180 per year, which rate was not large enough to return to the defendants the actual cost of the power. That the theory on which the defendants' plant is operated is that it will earn enough in profits to pay the principal and interest on the bonds referred to in the original bill of complaint, the expenses of operation and of maintenance of the plant and system in good repair and working order, and to build up a reserve for depreciation of said plant. That the general funds of the village are not to be invaded or used for the purpose of covering losses of said plant. That before the construction of said plant the village was paying $175 per month for 140 street lamps. That for the period from February 1, 1938, to April 1, 1941, the municipal plant furnished 143 street lamps to the village for $175 per month. That April 1, 1941, the defendants charged the village for the same number of lamps $215.60, or an increase of $40.60 per month. That at the hearing on April 9, 1941, the defendants found it necessary to increase their rates as provided for in the decree, and in order to still give a preference to the Constantine Creamery Company, the defendants adopted the device May 1, 1941, of increasing the charge on the street lamps from the rate last above mentioned to $259.15 a month, or an increase of $53.55 a month, making a total increase of $95.14 per month, or a yearly increase of $1,129.80 over the price charged and collected from the general fund of the city for street lamps up to April 1, 1941.

"That this plaintiff is informed and believes that on May 6, 1941, the defendant sent to most of its

electric current users a postal card not telling the
full truth, saying among other things—

" 'Residential rates and commercial rates RE-
MAIN THE SAME as set when the municipal plant
was first started. There has been an adjustment in
commercial power rates only.'

"That in truth and fact they had used the device
of increasing the rates on the street lights, payable
out of the general fund, in order to save a change
in said rates.

"(3) That the defendants have unlawfully vio-
lated the terms of the decree and injunction issued
herein."

In pursuance of such petition an order was is-
sued requiring defendants to show cause why they
should not be adjudged guilty of contempt of court.
Defendants filed answer asking that such petition
be dismissed. In their answer defendants alleged
that they had complied with the court's decree and
that:

"(1) It (Village of Constantine) has established
a graduated power rate scale applicable to all
power users. No separate rates are made to any
user.

"(2) While the court has not ordered the village
to set up a cash reserve for depreciation, the vil-
lage now has in said fund $1,169.68.

"(3) That the village is not discriminating among
its customers, all being treated alike.

"(4) That the village is using no device what-
ever to collect a rate less than the established rate.

"(5) That all terms of the mortgage are being
met promptly.   *   *   *

"Hence, all things ordered by the court have been
complied with to the fullest extent. No device what-
ever has been used to circumvent or avoid the
court's orders in any manner whatsoever.   *   *   *

"In answer to paragraph 3 of plaintiffs' bill, the defendants state that in no manner whatsoever has the village or its officers violated any of the terms of the decree and injunction issued by this court."

The matter was brought on for hearing and testimony was taken regarding the operation of the light plant, the cost of producing electric current, the increased charge to the village for street lighting, the cost of and charge for current furnished the Constantine Creamery Company, and regarding the building up of a reserve for depreciation of the plant and system. The record contains only excerpts from such testimony.

In its findings filed October 16, 1941, the trial court ably and comprehensively reviewed the pending litigation, and a decree was entered November 1, 1941, determining that defendants were not guilty of contempt and dismissing plaintiffs' petition. Plaintiffs' motion to set aside such decree was denied and they appeal in the nature of mandamus.

Plaintiffs ask this court to enter an order "directing the trial judge to set aside his decree of November 1, 1941, and to enter a decree finding the defendants guilty of contempt and directing them to carry out the decree of January 25, 1941."

The State Constitution, 1908, art. 8, § 23, and 1 Comp. Laws 1929, §§ 1684, 1692 (Stat. Ann. §§ 5.1420, 5.1428), gave the defendant village the right to acquire, construct, own and operate a municipal electric light plant. 1 Comp. Laws 1929, § 1689 (Stat. Ann. § 5.1425), gave the defendant village council the power to fix "such just and equitable rates as may be deemed advisable for supplying the inhabitants of such village with lights."

We have recognized that a municipality's operation of a public utility, although it may be a pro-

prietary activity, constitutes engaging in a public enterprise for a public purpose. *City of Traverse City* v. *Township of Blair*, 190 Mich. 313 (Ann. Cas. 1918E, 81); *Wood* v. *City of Detroit*, 188 Mich. 547 (L. R. A. 1916C, 388); *Mitchell* v. *City of Negaunee*, 113 Mich. 359 (38 L. R. A. 157, 67 Am. St. Rep. 468).

Where a municipality has the power to engage in an activity for a public purpose, the courts will not interfere with the discretionary acts of its municipal officials. *Putnam* v. *City of Grand Rapids*, 58 Mich. 416; *Nelson* v. *County of Wayne*, 289 Mich. 284; *White* v. *City of Grand Rapids*, 260 Mich. 267; *Andrews* v. *City of South Haven*, 187 Mich. 294 (L. R. A. 1916A, 908, Ann. Cas. 1918B, 100); *Bauman* v. *Campau*, 58 Mich. 444; *Torrent* v. *Muskegon Common Council*, 47 Mich. 115 (41 Am. Rep. 715). See, also, 6 (Rev.) McQuillin on Municipal Corporations (2d Ed.), p. 964, § 2755. In *Veldman* v. *City of Grand Rapids*, 275 Mich. 100, 113, we said:

"In order to warrant the interposition of a court of equity in municipal affairs, there must be a malicious intent, capricious action or corrupt conduct, something which shows the action of the body whose acts are complained of did not arise from an exercise of judgment and discretion vested by law in them."

In *Putnam* v. *City of Grand Rapids, supra,* p. 419, this court stated:

"There has been an idea in some places, as apparent from reported cases, that courts of equity can always stand between citizens and municipal authorities, to shield them from abuses and extravagant action. This is not one of the functions of courts. It is one of the incidents of popular government that the people must bear the consequences of the mistakes of their representatives. No court can save them from this experience. It is one of the

means of teaching the necessity of choosing proper servants, and being vigilant to obtain reform from abuses. The discretion which is necessarily vested in public functionaries cannot be reviewed by any one else. If they go beyond the range of the discretion given them, and mischief happens or is likely to happen, a case arises for the interference of judicial authority to keep them within the lines bounding their agency. But their mistakes within those lines are beyond legal redress.''

In the present case defendants would not be guilty of contempt of court because of their good-faith errors in judgment or discretion in connection with their operation and management of the electric light plant. They would be guilty of contempt only in case of fraud, dishonesty, or abuse of discretion in their official duties.

Plaintiffs complain of discrimination in rates in favor of the Constantine Creamery Company. The testimony shows that after defendants were found guilty of contempt in April, 1941, they caused the then-existing power rates to be revoked and adopted a new schedule of power rates applicable to all users and also a new schedule of street lighting rates, and that subsequent bills were sent out under such new rates. The new schedules adopted by the council of defendant village on April 29, 1941, were as follows:

## "POWER RATES

"First 50 kwh's at.................$ .07
"Next 50 kwh's at................ .06
"Next 1,000 kwh's at.............. .04
"Next 1,500 kwh's at.............. .03
"Balance kwh's at................ .02
"Minimum: 50 cents per h. p. connected per month.

"STREET LIGHTING RATES
"107 overhead lights, 200 watts, at $1.65
per month, each.
"10 overhead lights, 300 watts, at $2.50
each per month.
"26 ornamental lights, 300 watts, at $2.60 .
each per month."

In its findings on the question of rates charged
the Constantine Creamery Company, the trial court
stated, in part:

"It was defendants' duty under the provisions·
of their trust mortgage to establish and maintain
rates sufficient to take care of the principal and in-
terest on their bonds, to pay all expenses of opera-
tion and of maintenance of said plant and system
in good repair and working order and to build up
a reserve for depreciation of said plant. The court
in its decree ordered them to establish rates suffi-
cient to accomplish said purpose. In order to do so
and to take care of the objectionable features of
their former rate schedule for which they had been
held to be in contempt, to-wit: the flat power rate
to the Constantine Creamery Company, and rates ·
sufficient to build up a reserve, they adopted this
new schedule, which the testimony shows is taking
care of all the provisions of·the trust mortgage and
is building up a reserve for depreciation. * * *
"The power rates as now established apply to all
users of power and are based on a sliding scale, so
that the customers who use more power get a reduc-
tion in rate the more energy or power that is used.
This sort of a rate is usual and customary, and does
not, as the former flat rate of $.0215, discriminate
in favor of the creamery company. It is true that at
the present time the creamery company is the only
user of electrical energy that uses sufficient energy
to bring it within the lower brackets of said power

rate. However, there is no discrimination in favor of the Constantine Creamery Company and they are not furnishing said company energy for less than the established power rate, which applies to all users of power alike.

"Such a rate is justifiable on the basis that where a consumer such as the Constantine Creamery Company uses a large amount of electrical energy distributed throughout the day, during a large portion of which time the electrical plant is operating on an off-peak load, it is good business, providing the same is not being furnished at less than the cost of production and distribution. The testimony shows that the amount of energy as furnished to the Constantine Creamery Company under the present power rates, when figured on their total bill, brings a flat rate of $.217 per k. w. h. for said energy which is more than the actual cost of production and distribution of said energy to the Constantine Electric Company, exclusive of bond retirement, interest and depreciation. The testimony further shows that the creamery company is now being billed for its lights at the regular rate fixed for commercial lights rate and the same is not included in the same rate as their power bill. Under the testimony as submitted, I am of the opinion that the defendants are not now discriminating as to the rate charged the Constantine Creamery Company, from that charged other customers of electrical energy, and that they are not collecting from them directly or indirectly a rate less than the established rate."

From a careful study of the record and exhibits we are satisfied that the trial court was correct in its conclusion that defendants were not, at the time of the hearing in August, 1941, discriminating in the rates charged the creamery company and that such rates charged did not violate the trial court's decree. See 2 Pond, Public Utilities (4th Ed.), p.

1064, § 573; Reed, Municipal Management (1941), p. 606.

Plaintiffs further contend that, in order to make up the loss of revenue occasioned by the alleged discrimination in rates in favor of the Constantine Creamery Company, defendants have improperly increased the rates charged the defendant village for street lighting far beyond the value of the service received and that such increase constitutes an unlawful invasion of the general fund of the village.

The record shows that prior to the construction and operation of its own municipal light plant the village had paid a private utility company $175 per month for street lighting and that such rate was continued by the municipal plant until about March, 1941, when the rate was increased to $215.60 per month, and again increased in April, 1941, to $269.15 per month. It reasonably appears that one of the reasons for constructing the municipally-owned light plant was to provide defendant village with better street lighting. Prior to erecting the municipal plant the village had paid $175 per month for approximately 6,922 kilowatt hours, and at the time of the hearing in August, 1941, was paying the municipal plant $269.15 per month for 32,200 kilowatt hours. The rate charged the village for street lighting was apparently not out of proportion to the rate charged other users of current, as the evidence indicates that the cost of producing current for street lighting is considerably more than the cost of producing current for other consumers. The trial court, in its findings on the question of rates charged for street lighting, stated, in part:

"Plaintiffs complain that the defendants have raised the rates as to street lighting and contend

this was done so that defendants could sell to the creamery company at less than the cost of production. It is apparent from what has been said that the rate at which electrical energy is furnished to the creamery company does not violate the terms of the decree or the injunction. The defendants had a right to raise any of its rates to meet the terms and conditions of the trust mortgage, including the rates for furnishing energy or power for street lighting for the village and if the same is fair and reasonable then no one has a right to complain. * * * The testimony now shows that the Constantine Electric Company is collecting $269.15 from the village for street lights. However, the rate at which these lights are furnished is $.025 per k. w. h. and that under their former contract with the Michigan Gas & Electric Company the village was paying $.0662 per k. w. h. for said street lights.

"It is also apparent from the testimony that the rate charged the village for street lighting is not out of proportion to the rate charged other users of electrical energy, especially when the evidence discloses that it costs more to furnish the energy required by a street lighting load than it does to other consumers of a diversified load. The testimony shows that under the present rate residential consumers pay as high as 7 cents per k. w. h. and may obtain a rate as low as 1¼ cents per k. w. h. if they used sufficient current to meet that class, and the power users including the creamery company pay as high as 7 cents per k. w. h. and can obtain a rate as low as 2 cents per k. w. h. if they use sufficient current to come within that class, it is therefore apparent that the charge of $.025 per k. w. h. to the village for street lights, which costs more than a diversified load, is not unreasonable and unfair, and it is not therefore subject to the objection raised by plaintiffs that the increase in street lighting is merely a device or subterfuge used by defendants to discriminate in favor of the creamery company,

but is a just and fair rate that the defendants have a right to charge for the street lighting service, and which under the terms of their trust mortgage they are to furnish at a fair rate along with other rates charged consumers sufficient to meet the requirements of said trust mortgage, and the defendants are not therefore guilty of contempt in raising said rates for street lighting."

From our examination of the record and exhibits, we find no evidence of fraud or abuse of discretion by defendants in increasing the charge for street lighting. It was not an unlawful invasion of the village general fund to increase the charge for street lighting in view of the increased service rendered. We agree with the conclusion of the trial court that defendants were not guilty of contempt of court by reason of their increasing the charge for street lighting.

Plaintiffs next contend that defendants are guilty of contempt, because about May 6, 1941, after adopting a new rate schedule, they sent a post-card notice to their customers, which stated:

"Residential rates and commercial rates REMAIN THE SAME as set when the municipal plant was first started. There has been an adjustment in commercial power rates only."

Plaintiffs argue that such notice was a "deception calculated to lull the users into the belief that while the residential and commercial rates remained the same, that there had been a substantial change in power rate, which was not the truth." In its findings on this point, the trial court said:

"I cannot agree with plaintiffs' construction of said notice. The statement was evidently intended to assure the consumers there was no change in the rates charged for residential and commercial pur-

poses, so that they would not become alarmed that a change was to be made therein and stop the service. The statement as made was true."

We are satisfied that the trial court was correct in its determination that defendants were not guilty of contempt in sending such notice regarding rates to customers of the light plant.

Plaintiffs further contend, in substance, that defendants are violating the trial court's decree of January 25, 1941, by failing to increase the rates for all electric current sold so as to produce revenue sufficient to meet the expense of operation and maintenance of the light plant and system, interest payments and bond retirement, and to build up a reserve for depreciation which will equal the replacement cost of the plant and system at the end of its life. In other words, plaintiffs claim that the decree of the trial court requires defendants to charge rates which, in addition to all other necessary disbursements, will build up a reserve for depreciation sufficient to replace the plant and system. It should be noted that the light plant revenue bonds issued by defendant village were not in default, and the bondholders and their trustee are not parties to this suit and are not, so far as the record shows, complaining of defendants' acts and doings. The record indicates that defendants have set up a reserve of $1,000 per year for depreciation. It is admitted that such amount of reserve will not build up the replacement cost of the plant. Neither the trust mortgage nor the decree requires defendants to set up a "reserve for depreciation" sufficient to meet the replacement cost of the plant. However, the provisions of the trust mortgage (above quoted) do require the defendant village "to build up a reserve for depreciation" and, from sur-

plus revenues, to "establish and maintain a reserve for depreciation." The decree of January 25, 1941, also provides for the building up of "a reserve for depreciation of said plant."

In its findings the trial court stated:

"The trust mortgage does not state what amount is to be set aside as a cash reserve for depreciation, it merely states, 'and to build up a reserve for depreciation of said plant.' The court on the former hearing for contempt after listening to the testimony of the defendants' auditor, Mr. Morton, suggested that said reserve for depreciation should be not less than $1,000 per year. The audit of May 31, 1941, shows that they have set aside a cash reserve of $1,000 for depreciation for the year and that there is a profit before book depreciation of $6,303.95 and after book depreciation, a net profit of $722.61. It is apparent from said audit that the rates as now established are sufficient over the year to build up a cash reserve of at least $1,000 for the year, and pay all other expenses required by the trust mortgage."

From examination of the financial statements and excerpts from the testimony, contained in the record, it fairly appears that defendant village, at the time of the hearing in August, 1941, was charging rates for electric current reasonably calculated to produce a revenue sufficient to cover the operation and maintenance of the plant and system, interest payments and bond retirement, and an annual reserve for depreciation, though not a sufficient reserve to cover the replacement cost of the plant and system at the end of its life.

The pertinent question on this point of the case is whether the trial court's decree of January 25, 1941, requires defendants to charge rates sufficient to set up a reserve for depreciation to meet ordinary

contingencies and emergencies, or whether such decree requires defendants to charge rates which will build up a reserve equaling the replacement cost of the plant and system at the end of its life. Plaintiffs apparently fail to take into consideration the basic difference in the nature, ownership, and purpose of a municipally-owned utility and a privately-owned utility. A privately-owned utility is created and operated primarily for the purpose of profit for the shareholders. Such private utility is expected to earn a return on the investment therein and to pay its indebtedness and keep the corpus of the investment intact by building up a reserve for depreciation equaling the replacement cost of the utility. Public regulatory bodies, recognizing the nature and purpose of private utilities, permit them to charge rates which will return an income to investors and will build up a reserve for replacement of the property. *Michigan Public Utilities Commission* v. *Michigan State Telephone Co.*, 228 Mich. 658 (P. U. R. 1925C, 158); *Ann Arbor R. Co.* v. *Fellows*, 236 Fed. 387. See, also, *Federal Power Commission* v. *Natural Gas Pipeline Company of America*, 315 U. S. 575 (62 Sup. Ct. 736, 86 L. Ed.—).

The question as to what amount a municipally-owned public utility should set aside for depreciation does not appear to have been determined in this State.

A municipally-owned utility is built and operated, not for a corporate profit, but for the purpose of providing utility services at a reasonable cost to the citizens of the municipality, who are generally identical with the customers. For a municipally-owned light plant to charge rates which will, in addition to the necessary expenses of construction and operation, build up a reserve for depreciation equaling

the replacement cost of the plant, is to require the citizens and customers not only to pay for construction of their own utility but also to provide the capital for the construction of a new plant to serve future users. The distinction between rates to be charged by a municipally-owned utility and a privately-owned utility is well expressed in Reed, Municipal Management (1941), p. 616, as follows:

"It is not necessary for a municipal utility, which is required by law to amortize its debt and which possesses the legal capacity to borrow, to accumulate also a reserve fund to replace its properties as they wear out. This is properly required of private utilities which expect to retain their bonded debt as a permanent part of their financial structure. To require it of a municipal utility, however, is to ask the consumers to pay off the capital investment twice, once as a debt service and again in the establishment of a depreciation reserve."

See, also, 1 Spurr, Guiding Principles of Public Service Regulation, p. 616 *et seq.*; Buck, Municipal Finance (1930), p. 530 *et seq.*

The trial court's decree of January 25, 1941, and the trust mortgage securing the bond issues do not require defendants to charge rates for electric current which, in addition to all other necessary disbursements, would build up a reserve for depreciation sufficient to equal the replacement cost of the plant and system. It reasonably appears from the record that the rates being charged by defendants at the time of the hearing in August, 1941, were sufficient to build up such a reserve for depreciation as was required by the trust mortgage and the trial court's decree. We conclude that defendants were not guilty of contempt of court in failing to further increase such rates.

We do not pass upon the wisdom or judgment of defendants in fixing the rates in question. We only determine that the record does not disclose fraud, dishonesty, abuse of discretion, or violation of public duty by defendants, and does not disclose acts of commission or omission for which defendants should be adjudged guilty of contempt of court.

The trial court had jurisdiction to make and enter its decree of November 1, 1941, though such decree might result in some modification of its prior decree of April, 1941.

In view of our conclusions other contentions by plaintiffs do not require consideration.

The decree of the trial court entered November 1, 1941, dismissing plaintiffs' petition is hereby affirmed. Defendants shall recover costs.

CHANDLER, C. J., and BOYLES, NORTH, BUTZEL, BUSHNELL, and SHARPE, JJ., concurred. WIEST, J., took no part in this decision.