Neal HARDY (substituted for Julian Zimmerman), Commissioner, Federal Housing Administration, Appellant,

v.

ISLAND HOMES, INC., an Alaska corporation, Appellee.

ALASKA HOUSING AUTHORITY, a public corporate authority of the State of Alaska, Appellant,

v.

Neal HARDY (substituted for Julian Zimmerman), Commissioner, Federal Housing Administration, and Island Homes, Inc., an Alaska corporation, Appellees.

Nos. 39, 40.

Supreme Court of Alaska.

July 11, 1961.

George M. Yeager and Howard E. Haskins, Jr., Fairbanks, and James R. Clouse, Anchorage, for Commissioner, Federal Housing Administration.

Walter Sczudlo, Fairbanks, and Josef Diamond, Seattle, Wash., for Island Homes, Inc.

Henry J. Camarot, McNealy, Merdes & Camarot, Fairbanks, and Clifford J. Groh, Anchorage, for Alaska Housing Authority.

Before NESBETT, C. J., and DIMOND and AREND, JJ.

DIMOND, Justice.

The basic controversy here has to do with the rate to be charged by Island Homes for utility services it has furnished dwellings located in a housing project near Fairbanks, Alaska.

In 1952 Island Homes constructed a 150 unit housing project on Bentley Island, Slater Subdivision, adjacent to the City of Fairbanks, with financing provided by the Alaska Housing Authority and the Federal Housing and Home Financing Agency.

In connection with this project, provision was made for certain utility facilities, including a sewage collection and disposal system. These were constructed by the United States under the Alaska Public Works Act,[1] with one-half the cost being assumed by the United States and the other half being paid by Alaska Housing Authority.

On January 14, 1952 an instrument entitled "Trust Deed" was executed by Island Homes and the Authority. By this document Island Homes conveyed to the Authority, as "trustee", the sewer plant and all of Island Homes' right, title and interest in the real property upon which the plant was located. The instrument stated that Island Homes was the owner of the property, but there is nothing in the record of this case which discloses how such ownership had been acquired. The deed recited that it was executed for the benefit of all present and future owners of the dwellings in order that they might be assured of an adequate and continuously operated system for the disposal of sewage. The primary concern of the parties to this appeal is with paragraph five of the trust deed, which authorized Island Homes to levy and collect a monthly or quarterly charge for the sewerage service rendered. It was specified that such charge be—

"* * * at a rate and in an amount approved as reasonable by the Authority, after giving consideration to the costs of furnishing such service, including costs of operation, repairs, replacements, and depreciation, and reasonable compensation of Island Homes, Inc., as approved by the Authority."

1. 63 Stat. 627 (1949), 48 U.S.C.A. §§ 436–486j (1952).

Prior to November 1, 1956 Island Homes had furnished for 123 dwellings, then owned by FHA, not only sewerage service, but also street maintenance (including snow removal), street lighting, and fire protection. Because of a controversy over the amount to be paid for these services, Island Homes brought an action against FHA in 1957.[2] In October of that year the suit was settled by a stipulation and consent judgment. FHA agreed to pay Island Homes for all such services at the rate of $15 a month per dwelling, and the latter agreed that after November 1, 1956 it would be responsible only for sewage collection and disposal, and that the other services, such as maintenance of streets, fire protection, etc., would be furnished by the Alaska Housing Authority.

The parties were unable to agree on the rate to be charged for sewage collection and disposal. Island Homes at first took the position that $20 a dwelling unit each month was reasonable. Later, after negotiations with FHA and the Authority, Island Homes proposed a $12 charge, but only on the condition that this would be temporary and would be subject to renegotiation based on a determination of actual costs involved. Finally, it decided on a monthly charge per dwelling of $13.50 for the period commencing November 1, 1956. Payment was refused, and in November 1957 Island Homes commenced this action to collect what it claimed was owing it for services furnished the dwellings owned by FHA. The Authority was brought into the suit by FHA as a third party defendant.

Prior to the commencement of this action the dispute over the sewerage rate had existed principally between Island Homes and the Authority. The latter had invoked paragraph five of the trust deed, which authorized Island Homes to levy a charge "at a rate and in an amount approved as reasonable by the Authority", and had steadfastly maintained that it was unable to approve any monthly charge in excess of $3.50 per dwelling unit. The apparent reason for this was the Authority's lack of success in obtaining from Island Homes adequate and detailed accounting records from which the costs of providing the service could be computed with any degree of accuracy. It was not until the trial of the action that Island Homes made available proper records, and from these the Authority estimated that a fair and reasonable charge would be $6.01 per unit each month.

The case was tried without a jury, and the court below found that a fair and reasonable charge was $13.50 per dwelling, per month. From the judgment entered in favor of Island Homes, both FHA and the Authority have appealed. There are several issues to be considered—the principal one being whether the district court erred in finding that a rate of $13.50 was fair and reasonable.

1. *Reasonableness of Rate:*

The answer to this first question depends largely upon a construction of the trust deed. As noted earlier in this opinion, paragraph five authorized Island Homes to levy and collect a charge for sewage collection and disposal at a rate approved as reasonable by the Authority, after giving consideration—

"* * * to the costs of furnishing such service, including costs of operation, repairs, replacements, and depreciation, and reasonable compensation of Island Homes, Inc., * * *."

The trial court's determination of what constituted a reasonable rate was presumably based upon the books, records and accounts of Island Homes which were introduced in evidence, and upon the testimony of witnesses relating to various items constituting alleged operational expenses. In its brief the Authority argues that these records were so inaccurate and subject to so many discrepancies that they were improperly admitted into evidence; and that even if they had been admissible, they

2. Island Homes, Inc. v. Norman P. Mason, Commissioner of Federal Housing Administration, Civil Action No. 9359, District Court for the District (Territory) of Alaska, at Fairbanks.

did not support the alleged expenses of operation and management of the sewer system.

This, however, does not represent the real disagreement between the parties.[3] From an examination of the transcript of evidence and proceedings at the trial, we find that the true disparity in positions taken by each of the parties centers around the words "replacements and depreciation", as used in paragraph five of the trust deed. It' was Island Homes' view (and the trial court agreed with this) that the quoted words permitted it to include as "costs of operation" an amount sufficient to replace the entire system at the end of its estimated useful life which, depending upon the particular component parts involved, varied from ten to forty years. This amounted to approximately $10,000 a year, and was in addition to an item of costs noted as "maintenance and repair" approximating $1,300 a year, which apparently represented among other things, monies expended for the casual replacement of mechanical and other items of plant and sewer equipment which became worn out from time to time.

■ If Island Homes were the owner of the sewer plant and system by reason of an investment it had made, then "depreciation", in the sense of that term as urged by Island Homes, might be taken into consideration in fixing the sewerage rate. This would be so because a private utility would be expected to not only earn a return on its investment, but also keep the corpus of the investment intact by building up a reserve for depreciation equaling the replacement costs of the utility.[4]

■ But the record here militates against the existence of that type of situation. The entire sewer system was constructed by the United States under an agreement with the Authority at a cost in excess of $577,000. After completion, and in accordance with the terms of the agreement and the provisions of the Alaska Public Works Act,[5] fifty per cent of this cost was paid by the Authority to the United States; and the latter, on March 1, 1956, executed and delivered to the Authority a deed to what was described as "sewage collection and disposal facilities, including 10,180 lineal feet of wood stave pipe mains and laterals, a sewage treatment plant, 25 manholes and other necessary appurtenances." There is nothing to establish that Island Homes ever had title to any of this property. And if it had, this was disposed of when it executed the trust deed and conveyed to the Authority what was described as "the sewerage collection system, in its entirety, including all appurtenances thereunto and including easements over, under and along the streets, roads and avenues of said subdivision."[6]

It is true that the trust might be terminated. But this contingency could occur only if some city or other public body took over and operated the existing system or provided other facilities, or if some person, firm or corporation, acceptable to the Authority, agreed to operate the existing system according to the terms of the trust instrument. There was no provision for payment to Island Homes in the event that the system was turned over for operation and maintenance to a city, public body or some other person. This negatives any possibility that Island Homes had some interest in the facilities which would necessitate its building up a reserve to replace the system at the end of its estimated useful life.

Another salient factor is the absence of any requirement on the part of Island Homes to create and maintain an actual reserve account so that funds would be available, when the property was ultimately

3. Maurice Gebhart, Executive Director of the Authority, conceded on cross-examination that Island Homes' figures on costs of operations were correct.

4. Wolgamood v. Village of Constantine, 1942, 302 Mich. 384, 4 N.W.2d 697, 704.

5. Supra, note 1.

6. This deed was executed in 1952, approximately four years before the facilities were constructed. The evidence does not explain this, nor does it disclose what interest in the then non-existent facilities Island Home had to convey.

retired, to construct a new plant and system. Counsel for Island Homes admitted, and in fact emphasized, that "we are not required to set up a trust fund in a reserve account to meet some contingency in the future." And the corporation's accountant stated under examination at the trial that such a fund would not be established, but that monies representing an allowance for depreciation would be available to the corporation at all times and, presumably, for any and all purposes.

The absence of any safeguard to prevent the dissipation or use of such funds, except for replacement of the system, is hardly consonant with the announced objective of the arrangement made between Island Homes and the Authority—which was to benefit the home owners in the project by assuring them of a continuously operated and properly maintained sewage disposal system. The trust deed does not require Island Homes to operate and maintain the facilities for any particular length of time. Conceivably, then, it might simply abandon the operation whenever it chose to do so, and leave the beneficiaries of the trust with a worn out plant and no capital for the construction of a new or rehabilitated system. This would be to disregard the distinct public interest which exists here, the furtherance and protection of which was one of the reasons for the creation and existence of the Alaska Housing Authority.

█ Considering all of these circumstances, we construe the words "replacements and depreciation", included as "costs of operation" in paragraph five of the trust instrument, as being limited to an amount reasonably necessary to keep the sewerage plant and facilities in good operating condition and repair so long as service is being furnished by Island Homes. We do not interpret that document as permitting Island Homes to charge a rate which will represent a reserve for depreciation equaling the replacement cost of the system. To the extent that the trial court permitted an annual allowance for such replacement to be included, it was in error in finding that the rate of $13.50 was fair and reasonable.

We cannot tell from the record, however, whether the disallowance of such item would leave Island Homes without any fair amount to take care of actual replacement costs as they become due—such as the replacement from time to time of worn out or defective mechanical equipment or other parts of the system. An adequate amount must, of course, be allowed for these contingencies in the fixing of any rate. Perhaps this has been done, but we are unable to establish it from the record. Hence, the case must be remanded to the superior court for a determination of what is a fair and reasonable charge in the light of the conclusions set forth in this opinion.

Island Homes also contends that under a proper interpretation of the trust deed, it may establish whatever rate it chooses without prior approval of the Authority. Its only obligation, it asserts, is to refund to the persons making payment any charge collected which is in excess of that approved by the Authority as reasonable after the rate had been established.

█ We disagree. Island Homes is entitled to levy and collect a charge "at a rate and in an amount approved as reasonable by the Authority." This calls for prior approval; the wording does not suggest that Island Homes, without the consent of the Authority, may establish and collect a charge which later on may be subject to disapproval if it is found to be unreasonable.

The reason for the existence of the Authority supports the construction we have adopted. It was created for the purpose of providing low cost housing projects in order to remedy an acute housing shortage in various parts of Alaska.[7] It was given the power to arrange or contract for services, works or facilities in connection with housing projects,[8] and to manage and operate the projects so that rentals might be

7. Section 40–7–1 A.C.L.A.Cum.Supp.1957.

8. Section 40–7–6 A.C.L.A.1949.

fixed at the lowest rates consistent with decent, safe and sanitary dwellings.[9]

Considering these factors, together with the part played by the Authority in providing the sewerage plant and facilities and the terms of the trust deed, we consider it apparent that the Authority was to act as interim manager of this utility in order to afford the occupants of the dwellings with adequate sewerage service and to protect them against excessive rates. These things could be accomplished with effect only if the Authority had the right to pass upon the reasonableness of the utility charge in the first instance.

2. *Evidence of Other Sewerage Operations.*

For the purpose of comparison and to show that Island Homes' costs were unreasonably high, the Authority attempted to introduce evidence of costs incurred by the City of Fairbanks in operating its sewerage facilities. This was excluded by the trial court on the ground that the dissimilarities between the two systems were so great that such evidence could have no probative value.

The differences between the two systems were substantial. The city's sewer lines covered a considerably larger area than those of Island Homes; and the latter provided its service for only 150 dwellings, while the city served a much greater population. Island Homes had one lift station; the city had nine. A sewage treatment plant was an integral part of the Island Homes operation, whereas municipal sewage was not treated at all but was discharged in a raw state into a river. There were basic differences in the method of supervising and managing each of the two systems.

■ If the proof offered by the Authority would have aided the court in determining whether Island Homes' costs of operation were reasonable, then it would have had probative value and would have been admissible. But if the dissimilarities between the two operations were so great that they could not be said to be reasonably comparable, then the court was justified in rejecting the proof because it would have served no useful purpose and might, in fact, have confused the issue to be determined. The decision on this question must, of necessity, be left to the sound discretion of the trial judge.[10] In this case he felt that the evidence of costs of operating the Fairbanks system would not be helpful. Considering the differences in the two facilities, as disclosed by the record, we cannot say that this determination was an abuse of discretion.

3. *Indispensable Parties.*

FHA was originally the owner of 123 dwellings in the housing project. By the time this action was tried, it had sold a large number of the houses to individual purchasers, none of whom were parties to the litigation. FHA's main argument on this appeal is that those persons were indispensable[11], that the judgment is ineffective in their absence, and that the case should be remanded for the purpose of joining them as parties to the action.

The pre-trial order provided that where houses have been sold by FHA, "any liability determined by the court would be respectively against the new owners." The court's finding, therefore, that a rate of

9. Section 40–7–8 A.C.L.A.Cum.Supp.1957.

10. Cf. Kelly v. Troy Laundry Co., 1928, 46 Idaho 214, 267 P. 222, 224; Jensen v. Southern Pacific Co., 1954, 129 Cal.App. 2d 67, 276 P.2d 703, 708; Annotation 118 A.L.R. 869, 904–905 (1939).

11. Fed.R.Civ.P. 19(a), 28 U.S.C.A., provides: "(a) *Necessary Joinder.* Subject to the provisions of Rule 23 and of subdivision (b) of this rule, persons having a joint interest shall be made parties and be joined on the same side as plaintiffs or defendants. When a person who should join as a plaintiff refuses to do so, he may be made a defendant or, in proper cases, an involuntary plaintiff."

In the words of Professor Moore this subdivision is a "generalized statement concerning necessary and indispensable parties to be read in the light of cases at law and in equity." 3 Moore, Federal Practice § 19.05 [1], at 2144 (2d ed. 1948).

$13.50 a month was fair and reasonable was, to say the least, of immediate concern to the individual home owners.[12]

■■ But parties will not be considered indispensable if they are beneficiaries of a trust whose interests their trustee may adequately represent.[13] That is the situation here. A solution of this controversy depends in major part upon a correct interpretation of the trust deed. By that instrument the Authority was vested with legal title to the facilities and was given express power to pass upon the reasonableness of the utility rate, for the benefit of present and future owners of the houses served by those facilities. A clear intent is manifested of protecting the home owners against excessive rates and of relieving them of the necessity of dealing personally with Island Homes over the proper charge to be paid. The Authority possesses such powers, is charged with such obligations, and has such a wide range of discretion in dealing with the subject matter of this litigation, that the interests of the individual property owners can be fairly said to have been adequately represented. They are not indispensable parties.

4. *Liability of Alaska Housing Authority.*

When the United States conveyed to the Authority the sewer facilities it had constructed, the deed stated that one of the considerations was the Authority's undertaking "to operate and maintain the said street, street lighting and sewage facilities * * *." Subsequently, FHA and the Authority entered into an agreement entitled "Management Contract." The Authority agreed here to provide the utilities for the housing project in consideration of the payment by FHA of $15 a month for each house served. A provision in the contract expressly recognized the existence of the trust deed. It permitted the Author-

ity to continue to allow Island Homes to operate the sewerage system, and provided that the Authority should pay Island Homes a reasonable amount for this service.

■ After this action had been commenced, FHA joined the Authority as a third party defendant, asserting that by virtue of the management contract the Authority would be liable for all amounts adjudged to be due from FHA to Island Homes. One of the issues to be determined at the trial, as stated in the pretrial order, was whether FHA or the Authority, or both, were liable for the unpaid sewerage services. At the conclusion of the trial the court found the Authority liable to FHA for the amount of the judgment rendered against the latter in favor of Island Homes, and judgment was entered accordingly. The Authority specifies this finding as error, arguing that since FHA had not presented a case in chief against the Authority at the trial, it had abandoned its third party claim; and that the management contract, relied upon by FHA to establish the Authority's liability, could not be construed as a contract of indemnity against the liability imposed upon FHA by the judgment obtained by Island Homes.

In its answer to the third party complaint the Authority stated that it was "ready and willing to pay to Island Homes, Inc. the reasonable value of the services performed by plaintiff Island Homes, Inc." This constituted a waiver of any defense it might have had to FHA's claim for reimbursement. There was no error in the court's finding on this point.

The Authority not only collected the $15 a month charge from FHA while it owned houses in the project, but also collected the same amount from the individuals who purchased houses from FHA. Where these latter collections were made, the court held the Authority directly liable to Island

12. In State of Texas v. Interstate Commerce Comm., 1921, 258 U.S. 158, 163, 42 S.Ct. 261, 66 L.Ed. 531, 537, parties were held indispensable because the decree would be of "immediate concern" to them.

13. Olson v. Miller, 1959, 105 U.S.App.D.C. 55, 263 F.2d 738, 740; Green v. Brophy, 1940, 71 App.D.C. 299, 110 F.2d 539, 542, 9 A.L.R.2d 1; Kerrison v. Stewart, 1876, 93 U.S. 155, 160, 23 L.Ed. 843, 845.

Homes for the monthly sewerage charge of $13.50 per dwelling.

The Authority contends this was error. It argues (1) that Island Homes in its complaint and amended complaint had asserted a claim only against FHA, and not against the Authority; and (2) that even if liability had been claimed, the most that Island Homes could recover would be the difference between the $15 collected and the proportionate part of that sum attributable to utilities other than sewerage service, i. e., street maintenance, street lighting, and fire protection, which the Authority had provided.

The first argument comes too late. Rule 14, Fed.R.Civ.P. permitted the Authority, as a third party defendant, to assert against Island Homes any defenses which FHA had to the former's claim, and to also assert any claim against Island Homes arising out of the transaction which was the subject matter of the complaint against FHA. But the Authority went further. It answered Island Homes' complaint in its own right, making allegations and asserting defenses that would be pertinent only on the basis that the third party complaint had enlarged the pleadings by placing Island Homes in the position of asserting a claim against the Authority. Furthermore, at the trial of the action FHA and the Authority consolidated their respective defenses, and in the words of counsel for the Authority, "approached this case on the basis that both were defending against Island Homes."

In addition, by stipulation among all three of the parties, an exhibit was introduced showing the collections from individual home owners made by the Authority after sale of the houses by FHA.

■ These matters point to only one conclusion: that the Authority had adopted the position of a party defending against a claim asserted by Island Homes. By its own action the Authority treated the complaint as having been enlarged to assert a claim against it. This amounted to a waiver of the requirement of a formal amendment to the complaint.[14]

■ The second argument advanced is equally unpersuasive. The trust deed called for Island Homes to provide and collect a charge for sewerage service. It provided the service, but has collected nothing for it. Instead, the Authority received payment, and now complains that if it is obliged to turn over to Island Homes that portion of the $15 collected from each home owner which represents an amount for sewerage service which is "reasonable", there will not be enough left to compensate the Authority for other utilities which it provided. In order to get itself out of this predicament, the Authority suggests that the $15 be first applied to street maintenance, street lighting and fire protection, and that the remainder (if any) be turned over to Island Homes as part credit toward whatever amount is finally determined as a reasonable charge for the sewerage service. The balance owing to Island Homes could then be collected by it directly from the property owners.

When the residents of the housing project paid the Authority $15 each month, they were entitled to believe they had paid in full for sewage disposal. To subscribe to the argument now made by the Authority would be to unfairly subject these people to possibly paying twice for the same service. This court will not condone such an obvious breach of the obligation of loyalty and good faith the Authority owes to the beneficiaries of the trust instrument. The court below was correct in finding direct liability against the Authority in these instances.

The judgment of the district court is set aside, and this case is remanded to the Superior Court, Fourth District, for further proceedings and the entry of a new judgment in conformity with this opinion.

14. Falls Industries, Inc. v. Consolidated Chemical Industries, Inc., 5 Cir., 1958, 258 F. 2d 277, 283–287.