[S.F. No. 23990. Jan. 7, 1980.]

COUNTY OF INYO, Petitioner, v.
PUBLIC UTILITIES COMMISSION, Respondent;
LOS ANGELES DEPARTMENT OF WATER AND POWER,
Real Party in Interest.

COUNSEL

L. H. Gibbons, District Attorney, Antonio Rossmann and Ann Nutt for Petitioner.

Janice E. Kerr, Hector Anninos and Ellen S. LeVine for Respondent.

Burt Pines, City Attorney, Edward C. Farrell, Chief Assistant City Attorney, and Edward A. Schlotman, Deputy City Attorney, for Real Party in Interest.

OPINION

**TOBRINER, J.**—Petitioner Inyo County seeks review of Public Utilities Commission (hereafter PUC) ruling No. 89576, holding that the PUC lacks jurisdiction over the water rates charged Inyo County and its residents by the Los Angeles Department of Water and Power (hereafter LADWP), a public utility owned and operated by the City of Los Angeles. The county emphasizes the need for PUC regulation because the county's residents, unable to vote in Los Angeles municipal elections, lack any political leverage to prevent exploitation by LADWP. Devoid of political or judicial remedy, petitioner argues, the county's citizens stand exposed to unreasonable water rates.

We point out that the Legislature has the power under article XII, section 5 of the California Constitution to confer authority and jurisdiction upon the commission to regulate the rates charged nonresidents by a municipally owned water system. As we shall explain, however, the PUC can only regulate rates charged by municipally owned public utilities if a specific statute confers such jurisdiction upon the commission. Yet the Legislature apparently has never granted the PUC authority to regulate water rates charged by municipally owned water corporations either to local residents or to customers beyond municipal limits. Consequently we must conclude that we should affirm the ruling of the PUC that it lacks jurisdiction to adjudicate the county's complaint.

A dramatic chapter in California history lies behind the present controversy.[1] The Owens Valley in Inyo County, situated in the lee of the

---

[1]The historical discussion in this opinion is based upon Nadeau, The Water Seekers (1974) part 1, and Smith (edit.), Deepest Valley (rev. ed. 1978) pages 188-227.

Sierra Nevada escarpment, receives little rain or snow. The annual snowmelt in the Sierra, however, sends numerous streams into the valley, which flowed through the Owens River into a large lake at the southern end of the valley. During the last decades of the 19th century and the early years of this century, farmers began to divert streams for irrigation, and the valley developed an agricultural economy.

The City of Los Angeles, however, finding its local water supply inadequate for current needs or future growth, also entered into the competition for Owens Valley water. It began to purchase water rights and, in 1913, completed an aqueduct from the valley to Los Angeles. During the 1920s the city continued to acquire water rights, overcoming intense local opposition from valley residents, who dynamited the aqueduct on several occasions and once forceably seized possession of the aqueduct gates.

As the city acquired virtually complete control of valley water, residents pressed damage claims for loss of business and declining value of property. Responding to those claims, the city began to purchase Inyo County land, eventually acquiring 240,000 acres. The city then constructed a second aqueduct, and extended its water rights north, taking in almost all of the Owens Valley watershed and including part of the Mono Lake Basin. Thus, Los Angeles obtained the water essential to its growth; Inyo County, deprived of its water, was transformed from a rich agricultural region to one dependent on tourism; the Owens River and Owens Lake ran dry.

During its acquisition of Inyo County water rights, the city also purchased the water systems of the Towns of Big Pine, Independence, Laws, and Lone Pine, four unincorporated communities in Inyo County. Acting through LADWP, the city administers these water systems, which do not connect with the aqueducts supplying Los Angeles itself.

The city derives authority to own and operate water systems for other communities from article XI, section 9 of the California Constitution, and section 211 (j) of the Los Angeles City Charter. The charter further directs LADWP to set water rates: "such rates shall be of uniform operation, as near as may be, and shall be fair and reasonable, taking into consideration, among other things, the nature of the use, the quantity supplied and the value of the service; provided, further, that the rates inside the city may be less, but not greater, than the rates outside the city for the same or similar uses." (L. A. City Charter, § 220(2).)

Rates, set by LADWP, must be approved by the Los Angeles City Council.

Until 1973, LADWP charged users in the four Inyo communities, including Inyo County itself, on a flat rate basis even though Los Angeles users paid metered rates. From 1973 to 1978, however, LADWP changed its Inyo rates to the metered rates that were charged city residents.[2] Inyo County filed suit in the Fresno County Superior Court to enjoin the increase. When that court denied the county's motion for preliminary injunction, the county filed the present complaint with the PUC.

In a unanimous opinion, the PUC dismissed the complaint for want of jurisdiction. The PUC reasoned that it had no jurisdiction over municipally owned utilities unless expressly provided by statute, and that the Legislature's failure to include municipally owned public utilities within the classes of regulated public utilities in divisions 1 and 2 of the Public Utilities Code[3] demonstrated that the Legislature had not granted the PUC such jurisdiction. The county seeks review of that decision.

The county argues that only regulation by the PUC can prevent abuse of LADWP's monopoly position. The PUC, it observes, was established to "protect the people from the consequences of . . . monopoly in the public service industries." (*Sale* v. *Railroad Commission* (1940) 15 Cal.2d 612, 617 [104 P.2d 38].) PUC regulation of rates charged by municipally owned utilities to municipal residents is not compelled because the residents exert political control over the rates. (Cf. *McDaniels* v. *Park-Woods Mutual Water Co.* (1971) 72 Cal.P.U.C. 247.) But because "the inhabitants of the outside city . . . have no voice as voters or taxpayers in the shaping of the affairs of the municipality engaged in

---

[2]Los Angeles City Ordinance No. 150,787. Nonresidents outside of Inyo and Mono Counties, however, are charged at 1.5 times the rates charged city residents. (L. A. Ord. No. 150,359.)

The gist of Inyo's complaint, as we understand it, is not that LADWP charges discriminatory rates to Inyo customers, but that its rates fail to take into account that such customers can be served at much lower cost than Los Angeles customers; the county objects in particular to paying for part of the cost of transporting Owens Valley water to Los Angeles and for part of the cost of furnishing Colorado River water (which is not used in Inyo County) to Los Angeles.

[3]Division 1 of the Public Utilities Code provides for regulation of public utilities; division 2 provides for regulation of related businesses such as highway carriers, household goods carriers, and charter carriers.

the business,...to deny the power of the commission to intervene is apparently to leave these consumers...at the mercy of the other city." (Comment (1921) 9 Cal.L.Rev. 252, 255; see *City of Lamar* v. *Town of Wiley* (1926) 80 Colo. 18 [248 P. 1009, 1010].) The county therefore urges that we uphold PUC jurisdiction to prevent municipally owned utilities from charging unfair or discriminatory rates to its nonresident customers.

The county further contends that without PUC review it lacks an adequate remedy to challenge unfair rates. ■ Although the county recognizes that it can institute suit in superior court to attack the LADWP rates (see *Elliott* v. *City of Pacific Grove* (1975) 54 Cal. App.3d 53 [126 Cal.Rptr. 371]; *People* ex rel. *Pub. Util. Com.* v. *City of Fresno* (1967) 254 Cal.App.2d 76 [62 Cal.Rptr. 79]; *Durant* v. *City of Beverly Hills* (1940) 39 Cal.App.2d 133 [102 P.2d 759]), it urges the inadequacy of that remedy. The county does not deny that decisions discussing judicial review of rates establish that a city which acquires the water system of another community incurs an obligation to deal fairly with its customers in that community and to provide them with reasonable service at reasonable rates. (See *South Pasadena* v. *Pasadena Land, etc. Co.* (1908) 152 Cal. 579, 587-588, 594 [93 P. 490].) Such an acquiring city, as to the water dedicated to the use of the outside community, holds "title as a mere trustee, bound to apply it to the use of those beneficially interested." (*Id.,* at p. 594; see *Durant* v. *City of Beverly Hills, supra,* 39 Cal.App.2d 133, 138.) Consequently, the county can sue to enjoin rates which are themselves "unreasonable, unfair, or fraudulently or arbitrarily established" (*Durant* v. *City of Beverly Hills, supra,* 39 Cal.App.2d 133, 139), or which discriminate without a reasonable and proper basis (*Elliott* v. *City of Pacific Grove, supra,* 54 Cal.App.3d 53, 59).[4]

Judicial review of rates, however, does not provide protection comparable to PUC proceedings. The PUC maintains an expert, independent staff to investigate rate requests; it renders an independent decision on each record that it examines. A court, in contrast, must limit its review to the rates established by the involved utility and must depend upon

---

[4]A showing that rates are discriminatory is in itself insufficient to fulfill the complainant's burden of proof (see *Durant* v. *City of Beverly Hills, supra,* 39 Cal.App.2d 133, 138); a showing, however, that such discrimination rests solely on the nonresident status of the customer, and not on the cost of service or some other reasonable basis, will prove the rate invalid (see *Elliott* v. *City of Pacific Grove, supra,* 54 Cal.App.3d 53, 59).

the expert testimony presented by the parties. (See *Sale* v. *Railroad Commission, supra*, 15 Cal.2d 612, 617-618.) Thus while judicial review can protect consumers against plainly unfair rates, that remedy does not offer an opportunity for the detailed analysis and careful structuring of rates possible in a PUC proceeding.

To establish PUC jurisdiction to hear the county's complaint, however, it must do more than present arguments which might persuade the Legislature to confer such jurisdiction. The county must demonstrate both (1) that the California Constitution permits the Legislature to grant the PUC such jurisdiction over municipally owned water corporations and (2) that the Legislature has enacted a statute exercising this authority. We review first the question of constitutional power.

The controlling constitutional provisions, article XII, sections 3 and 5, represent a revision without substantive change of the original 1911 and 1914 amendments. Those amendments had permitted the Legislature to extend the authority of the Railroad Commission to water companies and other public utilities.[5] Section 3 states in part that *"Private corporations and persons* that own, operate, control, or manage a line, plant, or system for the...furnishing of...water...to or for the public, and common carriers, are public utilities subject to control by the Legislature. The Legislature may prescribe that additional classes of private corporations or other persons are public utilities." (Italics added.) Section 5 grants the Legislature further authority: "plenary power, unlimited by the other provisions of this constitution but consistent with this article, to confer additional authority and jurisdiction upon the commission." ▮ The county relies primarily upon its contention that a municipal utility, when selling to customers beyond the municipal boundaries, constitutes a "private corporation or person" within the meaning of section 3.

---

[5]The 1911 constitutional amendments modified article XII, section 23 to permit the Legislature to grant the Railroad Commission, whose jurisdiction had previously been limited to transportation companies, jurisdiction over many other forms of public utilities including water companies. The amendments also modified section 22 to restate the powers of the Railroad Commission and authorized the Legislature to grant it additional powers.

The 1911 amendments had provided that the voters of a city could choose to retain city control over public utilities and thereby withhold jurisdiction from the Railroad Commission. The 1914 constitutional amendment limited this reserved power to enforcement of "local police, sanitary and other regulations, other than the fixing of rates."

In 1946 the Railroad Commission became the Public Utilities Commission.

To understand fully the county's position, we must begin with the 1908 decision in *South Pasadena* v. *Pasadena Land etc. Co., supra,* 152 Cal. 579, which expounds the law of utility rate regulation prior to the 1911 constitutional amendments. Plaintiffs in *South Pasadena* sought to enjoin the City of Pasadena from purchasing a private water system serving the neighboring City of South Pasadena on the ground, among others, that the inhabitants of South Pasadena would have no protection against arbitrary imposition of rates or termination of service by Pasadena.

Rejecting that contention, the court stated: "In administering a public utility, such as a water system, even within its own limits, a city does not act in its governmental capacity, but in a proprietary and only *quasi*-public capacity. . . . The powers of the two cities in regard to this water service will be separate and distinct. . .; South Pasadena, within its own limits, will be the sole representative of sovereignty in the fixing of rates, and in the supervision of the streets; and Pasadena will be subject thereto, as a private person. . . ." (152 Cal. at p. 593.)

Based upon this language, the county argues that LADWP, in supplying water to Inyo County and its residents, acts in a private, proprietary capacity. The county therefore contends that the 1911 and 1914 constitutional amendments authorizing Railroad Commission jurisdiction over "private corporations and persons" encompasses jurisdiction over such sales by LADWP. Putting the argument differently, the county maintains that the supplied city (South Pasadena in the cited case) possessed, prior to 1911, the power to regulate the rates charged by the supplying city, and that the 1911 and 1914 amendments transferred that power to the Railroad Commission.[6]

---

[6]The court in *City of Pasadena* v. *Railroad Commission* (1920) 183 Cal. 526, 535 [192 P. 25, 10 A.L.R. 1425], stated that "by reason of the recent amendment of section 19, article XI [authorizing cities to provide services to nonresidents], in the few cases where one city operates a municipal plant for a public service which extends into another city, there may be some doubt which one of the the two cities shall have the right to fix the rates for such outside service. The terms of the amendment are not clear on the question." Our review of the amendment indicates that, rather than being ambiguous on the subject, it does not deal with the issue at all, and thus leaves in effect the prior law, as stated in *South Pasadena,* that the city where the customers reside has priority in establishing rates for service.

For the analogy of the *South Pasadena* case to fit the present controversy, however, Inyo County would be compelled to maintain that a county government under pre-1911 law had authority to regulate the rates charged by public utilities to unincorporated communities within the county, and that the 1911 and 1914 amendments transferred this power to the Railroad Commission. It is not, however, clear that counties, as dis-

Later, in 1920, the Railroad Commission itself presented similar arguments to justify its asserted jurisdiction to regulate the electrical rates charged by the City of Pasadena to consumers in South Pasadena. This court unanimously rejected those arguments. We stated that "It is not true that a city is a private corporation when carrying on a municipally owned public utility. . . . The phrase 'private corporation'. . . should be given its natural and ordinary meaning, and. . . does not include municipal corporations." (*City of Pasadena v. Railroad Commission, supra*, 183 Cal. 526, 530.)

Noting that the ballot argument in favor of the 1911 amendment specified that it would "'extend the jurisdiction of the Railroad Commission to every kind of public service excepting that furnished by municipally owned plants'" (p. 531), the court stated that "To hold that under all these circumstances the voters nevertheless were aware of the refined distinction between the governmental powers and the proprietary powers of cities and towns and understood that municipal corporations, so far as they exercise proprietary functions, were to be included in the definition of public utilities and in the term 'private corporations,' seems to be the height of absurdity." (*Id.*) Dismissing the consumers' reliance upon *South Pasadena v. Pasadena Land etc. Co., supra*, 152 Cal. 579, the court declared that this precedent, decided in 1908, could have no bearing on the interpretation of the 1911 amendment.

The county contends that *City of Pasadena* was wrongly decided and should be overruled. It argues that the term "private corporations and persons" in the 1911 amendment confers jurisdiction upon the Railroad Commission over municipally owned utilities to the extent that such utilities were selling beyond municipal limits. The county, however, can point to no language in the constitutional amendments, the ballot arguments presented for or against those amendments, or the legislation enacted pursuant to those amendments which distinguishes a municipally owned utility operating within city limits from that operating outside

tinguished from incorporated cities, possessed the power to regulate utility rates. *South Pasadena* referring to sales by a municipally owned utility in another incorporated city, states that "If it were in a rural community, the rates charged would be subject to judicial control to make them reasonable. Being in another city, the serving city has a right to demand reasonable rates and may enforce them if not granted." (152 Cal. 579, 593.)

such limits.[7] Since the county concedes—as it must, in view of the history of the 1911 and 1914 amendments and the ballot arguments presented in their behalf—that the amendments do not encompass municipally owned utilities selling within city limits, its failure to find a basis for the distinction in the constitutional language fatally flaws its argument.[8]

The county also asserts that *City of Pasadena* v. *Railroad Commission, supra,* 183 Cal. 526, was discredited by our decision in *Los Angeles Met. Transit Authority* v. *Public Util. Com.* (1963) 59 Cal.2d 863 [31 Cal.Rptr. 463]. In the latter case, we upheld the constitutionality of a specific statute granting the PUC authority over safety standards of the Metropolitan Transit Authority. Noting that section 23 authorized PUC authority over "every private corporation...and every common carrier," we held the section encompassed all common carriers, including those owned by a municipal government. Our opinion expressly disapproved "statements in *City of Pasadena* to the effect that the Legislature is prohibited by the California Constitution from conferring regulatory jurisdiction over municipally owned public utilities." (59 Cal.2d at p. 870.) But *Los Angeles Met. Transit Authority* relies upon, and emphasizes, the explicit language that confers jurisdiction over "every common carrier" and does not involve itself in the question whether the term "private corporations and persons" in section 3 includes a municipally owned utility. The conclusion of *City of Pasadena* that the language of section 3 does not include such a utility is therefore not affected by the *Transit Authority* case.

Although we conclude that section 3 of article XII would not authorize legislation conferring PUC jurisdiction over a municipally owned water company selling beyond municipal boundaries, we note that the county persuasively points out that such legislation could be enacted under section 5 of that article. That section, we noted earlier, grants the

---

[7]Even the language from *South Pasadena* v. *Pasadena Land etc. Co., supra,* 152 Cal. 579, on which the county relies, fails to draw this distinction. It states that "[i]n administering...a water system, even within its own limits, a city [acts] in a proprietary and only *quasi*-public capacity." (152 Cal. at p. 593.) Such language offers no basis for treating a municipally owned utility as a "private corporation or person" only when it sells to outside customers.

[8]The county argues that the term "person" can be construed to include a municipal corporation (see *City of Los Angeles* v. *City of San Fernando* (1975) 14 Cal.3d 199, 277 [123 Cal.Rptr. 1, 537 P.2d 1250]), but does not explain how it can reasonably be construed to include a municipal corporation only to the extent that such corporation is selling to nonresidents.

Legislature "plenary power, unlimited by the other provisions of this constitution but consistent with this article, to confer additional authority and jurisdiction upon the commission."

Our decision in *City of Pasadena* discussed section 22 of article XII, the predecessor to current section 5. The section at that time granted the Legislature plenary power "unlimited by any provision of this constitution" and did not require that such power be consistent with article XII. The court observed, however, that such language could not be taken literally, since it would permit the Legislature to vest all powers of government in the commission. The court held that the section must be limited to the subject matter of article XII. Observing that section 22 before the 1911 amendment dealt only with common carriers and transportation companies, the court concluded that the authority conferred by section 22 should be limited to regulation of such enterprises. (183 Cal. at p. 533.)

In our opinion, *City of Pasadena*'s construction of section 22 (present § 5) is unduly narrow. Under both the explicit language of current section 5 and the basic reasoning of *City of Pasadena*, that section grants the Legislature the power to confer additional authority and jurisdiction on the PUC consistent with the scope of article XII. Article XII is not limited to common carriers and transportation companies, over which the commission has had jurisdiction since 1879, but deals with public utilities of all forms.[9] Thus possible legislation conferring PUC jurisdiction over municipally owned water companies, selling beyond municipal borders or even within such borders, would fall clearly within the scope of present article XII, section 5.[10]

Our final task must then be to determine whether the Legislature has enacted a statute conferring jurisdiction over municipally owned water systems selling to outside customers. Review of the pertinent legislation reveals no statute that expressly provides for such jurisdiction. We do find statutory references to municipal corporations as *purchasers* of water but absolutely no references to such corporations as *suppliers* of

---

[9]*City of Pasadena*'s assertion that a municipally owned utility is not a "public utility" within the meaning of article XII (see 183 Cal. at pp. 530-532), although not expressly disapproved by *Los Angeles Met. Transit Authority v. Public Util. Com.*, *supra*, 59 Cal.2d 863, is clearly inconsistent with the holding in the *Transit Authority* case sustaining PUC jurisdiction over a municipally owned common carrier.

[10]Language in *City of Pasadena v. Railroad Commission*, *supra*, 183 Cal. 526, contrary to the reasoning of this opinion is disapproved.

water. The omission of any reference to municipal corporations as suppliers of water can hardly serve as the basis for inferring legislative intent that such corporations be the subject of PUC regulation. As we shall explain, we have concluded that the Legislature has not exercised its constitutional authority to grant the PUC jurisdiction over municipally owned water companies supplying outside customers.

The Public Utilities Code provides for the regulation of water companies in sections 2701-2712. Section 2701 states the jurisdictional basis for such regulation: "Any person, firm, or corporation...owning, controlling, operating or managing any water system within this State, who sells, leases, rents, or delivers water to any person, firm, corporation, municipality, or any other political subdivision of the State...is a public utility...subject...to the jurisdiction, control, and regulation of the commission ...." Thus the seller, lessor, renter, or deliverer of water to a municipality may be regulated as a public utility but the municipality itself is not. Under this section municipalities may be purchasers from regulated public utilities, but are not themselves regulated utilities.

Nor do the earlier sections that define terms appearing in section 2701 so much as refer to a municipal utility. Section 240 defines "water system" as all facilities used for the storage, distribution, and sale of water. Section 241 states that "water corporation" includes "every corporation or person owning, controlling, operating or managing any water system for compensation ...."[11] The term "corporation" includes "a company, an association, and a joint stock association" (Pub. Util. Code, § 204); "person" includes "an individual, a firm, and a copartnership" (Pub. Util. Code, § 205). None of these sections mention municipal corporations. In contrast, section 207 dealing with recipients of utility service, defines the term "public, or any portion thereof" to include "a person, private corporation, municipality, or other political subdivision."

---

[11]The county notes that in *Los Angeles Met. Transit Authority* v. *Public Util. Com.*, *supra*, 59 Cal.2d 863, the court relied on the statutory definition of "common carrier" as including "every corporation or person engaged...in the ownership, control, operation, or management of any passenger stage ...." (59 Cal.2d at p. 868, quoting from Pub. Util. Code, § § 211, 226.) We held that a publicly owned carrier was still a common carrier within the quoted definition. (59 Cal.2d at p. 869.) The county suggests on similar reasoning that a municipal corporation operating a water system, should be considered a "water corporation" under section 241. The argument is plausible, but offers no basis for distinguishing between sales of that corporation to customers within city limits and sales to outside customers.

Section 216 does define the broad term "public utility." Subdivision (c) states that "When a person or corporation performs any service or delivers any commodity to any person, private corporation, municipality or other political subdivision of the state, which in turn . . . performs such service or delivers such commodity to or for the public . . . such person or corporation is a public utility subject to the jurisdiction, control, and regulation of the commission . . . ." Here the municipality appears as a middleman in the distribution of utility services; yet it is only the originating "person or corporation," not the municipality, which is a public utility subject to regulation.

Although none of the foregoing sections mentions municipally owned public utilities, the Legislature has not ignored that subject. Sections 10001 to 10251 expressly regulate municipally owned utilities. Section 10005 specifically authorizes municipally owned utilities to sell outside the corporate limits. No provision, however, grants the PUC jurisdiction to regulate the rates for such sales.[12]

■ Established doctrine declares that, "In the absence of legislation otherwise providing, the Commission's jurisdiction to regulate public utilities extends only to the regulation of privately owned utilities." (*Los Angeles Met. Transit Authority* v. *Public Utilities Com.* (1959) 52 Cal.2d 655, 661 [343 P.2d 913].) ■ The Court of Appeal noted the same principle in *People* ex rel. *Pub. Util. Com.* v. *City of Fresno, supra,* 254 Cal.App.2d 76, 81. We reiterated in *Orange County Air Pollution Control Dist.* v. *Public Util. Com.* (1971) 4 Cal.3d 945, 953 at footnote 7 [95 Cal.Rptr. 17, 484 P.2d 1361], that "The commission has no jurisdiction over municipally owned utilities unless expressly provided by statute." Significantly, when the Legislature first granted the PUC regulatory authority over the Los Angeles Metropolitan Transit Authority, it enacted such a specific statute (Stats. 1951, ch. 1668, p. 3804), and observed that in so doing it "has made exceptions to a long established policy. . . ." (Stats. 1951, ch. 1668, § 13.4.) No comparable enactment grants the PUC jurisdiction in the case at bar.

From the foregoing review of the relevant statutes, it is plain—and the county concedes—that the Legislature has not granted the PUC ju-

---

[12]In similar fashion, sections 11501 to 14509 regulate municipal utility districts. Section 12804 authorizes sales to customers outside the district limits, but no section provides for PUC regulation of such sales.

risdiction over rates charged by municipally owned utilities to municipal residents. Although the county seeks to distinguish regulation of rates charged nonresidents from those charged residents, we can find nothing in the statutes or the cases interpreting them which supports that distinction. However compelling the policy arguments in favor of such a distinction, we must reluctantly conclude that the Legislature has not as yet accepted that distinction as a basis for legislation extending the jurisdiction of the PUC.

Legislative inaction in this instance may stem from the fear that any statute conferring jurisdiction on the PUC would be unconstitutional under the reasoning of *City of Pasadena* v. *Railroad Commission, supra*, 183 Cal. 526. This opinion should make clear, however, that the Legislature possesses the power, pursuant to article XII, section 5, to grant the PUC regulatory authority over municipally owned utilities selling to outside customers. Although petitioner eloquently describes the inequity of subjecting the residents of Inyo County to the fixing of water rates by the LADWP over whom they have neither control nor check, and although we hold the Constitution enables the Legislature to confer jurisdiction upon the PUC to correct this situation, we can find no present statute or decision which sanctions PUC power to exercise a bifurcated rate regulation leaving the LADWP the power to fix water rates for residents of the city and delegating to the PUC the power to fix water rates for nonresidents.[13]

The order of the Public Utilities Commission is affirmed.

Bird, C. J., Mosk, J., Newman, J., and White, J.,* concurred.

---

[13]The county relies upon Colorado decisions, in particular *City of Lamar* v. *Town of Wiley, supra*, 248 P. 1009, which permit the Colorado Public Utilities Commission to regulate rates charged by municipal utilities to nonresident customers. The structure of Colorado constitutional and statutory law on this subject, however, is quite different from ours. Under Colorado statutes, public utilities subject to regulation include municipal utilities. (See Colo. Rev. Stats., § 40-3-103.) Their public utilities commission, however, is forbidden to interfere with the performance of a "municipal function" by the state Constitution (Colo. Const., art. V, § 35), which courts have construed to bar commission regulation of rates charged by a municipal utility to city residents. (See *Town of Holyoke* v. *Smith* (1924) 75 Colo. 286 [226 P. 158].) California statutes, on the other hand, fail to grant our PUC any authority over municipal utilities other than common carriers; thus the PUC lacks jurisdiction over sales to nonresidents whether or not such sales are considered a municipal function.

*Assigned by the Chairperson of the Judicial Council.

**MANUEL, J., Concurring and Dissenting.**—I concur in the judgment affirming the commission's order dismissing the complaint for want of jurisdiction. I do not agree, however, that article XII, section 5 of our Constitution grants the Legislature the power to confer on the commission jurisdiction to regulate municipally owned water companies. The express terms of that section establish that the Legislature's power "to confer additional authority and jurisdiction" must be exercised in a manner "consistent with this article"—i.e., article XII. In my view a municipally owned water company, being neither a "private corporation or person" nor a "common carrier" within the meaning of section 3 of that article, may not be made subject to commission jurisdiction under the present provisions of our Constitution. (See *City of Pasadena* v. *Railroad Commission* (1920) 183 Cal. 526, 532-536 [192 P. 25, 10 A.L.R. 1425]; cf. *Los Angeles Met. Transit Authority* v. *Pub. Util. Com.* (1963) 59 Cal.2d 863 [31 Cal.Rptr. 463, 382 P.2d 583].)

Clark, J., concurred.