[Civ. No. 52481. First Dist., Div. One. Dec. 10, 1982.]

AMERICAN MICROSYSTEMS, INC., et al., Plaintiffs and Appellants, v. CITY OF SANTA CLARA et al., Defendants and Respondents.

**COUNSEL**

Lingel H. Winters, Weyman I. Lundquist, J. Philip Martin, Ian N. Feinberg, Heller, Ehrman, White & McAuliffe and McGrane & Martin for Plaintiffs and Appellants.

Edwin J. Moore, City Attorney, Michael R. Downey, Assistant City Attorney, and Barry F. McCarthy, Deputy City Attorney, for Defendants and Respondents.

**OPINION**

**RACANELLI, P. J.**—The question presented on appeal is whether the City of Santa Clara (City) was under a duty to pass through to its ratepayers certain savings in costs of purchasing electrical power. For the reasons hereafter discussed following our grant of rehearing,[1] we again conclude no duty existed.

FACTS

The City of Santa Clara owns and operates a municipal electrical utility. Although it has no electrical generating facilities of its own, it purchases wholesale electrical power from Pacific Gas & Electric Company (PG&E) and the Western Area Power Administration of the United States Department of Energy (WAPA); the electric power is sold and distributed to local businesses and homes over city-owned power lines.

The billing for retail power sales is based upon rates adopted by the city council. Since 1973, the rates charged to customers have included, in addition to the basic rate, a "fuel cost adjustment" (FCA)[2] which reflects the changing fuel costs charged by PG&E in generating power without the necessity of further city council action.

---

[1]We granted rehearing principally to reconsider the limited issue of the propriety of the order sustaining a demurrer without leave to amend, discussed in Part IV, *infra.*

[2]The FCA is a fluctuating charge assessed against the ratepayers in accordance with a fixed formula, using the FCA charged to the City by PG&E, adjusted for the proportionate share of power purchased from PG&E. The power purchased from WAPA does not include an FCA.

Prior to 1971, the City received varying amounts of its power needs from WAPA. In 1971, however, WAPA began decreasing the supply of power available to the City, necessitating increasingly larger purchases from PG&E at the higher cost rate. As a consequence, the City commenced an action in the federal court to secure its rights to the relatively low cost WAPA electrical power generated by the federally funded California Central Valley Project. Simultaneously, the City withheld payment to PG&E in an amount representing the difference between the amount billed by PG&E and the amount which would have been payable for like purchases of federal power withdrawn by WAPA. By 1979, the amount withheld and deposited into an escrow account represented a fund in excess of $80 million.

A settlement was eventually reached by the parties (which included WAPA, PG&E and the City) resulting in a memorandum of understanding providing generally as follows: (1) The City and WAPA would execute a new agreement for the purchase and sale of Central Valley power effective January 1, 1980, under which the City would purchase power in amounts varying from 65 megawatts to 166 megawatts annually; (2) PG&E would pay the City $10 million, and the balance of the escrow fund would be released to PG&E.

The effect of the new agreement would substantially reduce the FCA component of the City's wholesale power costs.

On February 26, 1980, in anticipation of the settlement with PG&E and WAPA, the city council—after considering the possible adjustment of the existing utility rates—decided by oral motion passed and entered on the minutes to maintain the same retail charges; in effect, the council modified the FCA formula through billing the ratepayers under the presettlement FCA rates in order to yield the same level of revenues.

On August 26, 1980, the city council adopted an interim plan of adjusted rates and further resolved that "Any funds accrued under the present treatment of the Fuel Cost Adjustment and the interim implementation of Plan A would be available to fund Electric Department generation opportunities as they are individually approved by the City Council."

On November 13, 1980, the city council permanently implemented the interim rate adjustments. The council resolution noted that under the plan adopted "all customers would thereupon obtain a bill reduction for utility services while at the same time there would be a reservation in Santa Clara of some allowance to continue to build up reserves to better the Santa Clara posture in its application for relicensing of the Mokelumne Hydroelectric Project in itself, as well as to have funds available for other generation project acquisitions or construction, in order to carry out its plan to build up its generation properties and other

endeavors advantageous to ratepayers to gain independence from PG&E as a source of high cost power. . . ."

Plaintiffs filed a class action on behalf of all electricity ratepayers in the City seeking to compel the City to pass through to the ratepayers the cost savings realized in the City's purchase of WAPA power.[3] Thereafter, plaintiffs simultaneously filed a petition for a writ of mandate and a first amended complaint alleging causes of action for unjust enrichment, breach of fiduciary obligation, and breach of contract, seeking—inter alia—declaratory and injunctive relief.

Following plaintiff's motion for a preliminary injunction or writ of mandate, the City demurred to the first amended complaint. Thereafter, the trial court denied the requested relief and sustained the demurrer without leave to amend. This appeal ensued.

CONTENTIONS

The theory underlying plaintiffs' complaint may be reasonably synthesized to a claim that the City was legally required to pass on to the ratepayers both the $10 million PG&E refund and the reduced monthly costs resulting from the proportionate increase of WAPA power purchases. Plaintiffs advance a corollary thesis that the City must provide power at rates reflecting *only* its cost of purchase and operating/administrative expenses and is not authorized to accumulate excess funds derived from cost reductions. We disagree for the reasons which we explain.

I

A well-recognized treatise on municipal corporations summarizes the applicable standard with respect to rates fixed by a municipality in the following manner: "The rates charged by a municipally owned utility must be fair, reasonable, just, uniform and nondiscriminatory. . . . On the other hand, reasonable discretion must abide in the officers whose duty it is to fix rates. Their determination should not be disturbed if there is any reasonable basis therefor, or unless it is proved that the rates are excessive and the action of the rate-fixing officers illegal and arbitrary. It will be presumed, in the absence of any showing to the contrary, that the municipality acted properly. A rate lawfully established is assumed to be reasonable in the absence of a showing to the contrary, or a showing of mismanagement, fraud or bad faith, or that the rate is capricious, arbitrary or unreasonable. Each case must be decided on its

---

[3]The named plaintiffs are American Microsystems, Inc., Avantek, Inc., California Paperboard Corporation, Container Corporation of America, Dynacraft Incorporated, Gangi Brothers Packing Company, Hewlett-Packard Company, National Semiconductor Corporation and Siliconix Incorporated.

own facts. The burden of proof is on the party claiming unreasonableness or discrimination." (12 McQuillian, Municipal Corporations (3d ed. 1970, rev.) § 35.37a, pp. 483-484, fns. omitted.)

■ California law is consistent with this prevailing view. Because rate fixing is a legislative function within the exclusive province of the municipality, the courts will intrude only in the limited case where the rates are shown to be unreasonable, unfair, or fraudulently or arbitrarily established. (*Durant* v. *City of Beverly Hills* (1940) 39 Cal.App.2d 133, 139 [102 P.2d 759]; see *County of Inyo* v. *Public Utilities Com.* (1980) 26 Cal.3d 154, 159 [161 Cal.Rptr. 172, 604 P.2d 566].) There is a presumption that governmental officials have properly performed their duties. (Evid. Code, § 664.) Thus, the burden rests with the ratepayers to show that the utility rates are unreasonable, arbitrary or discriminatory. (*Elliott* v. *City of Pacific Grove* (1975) 54 Cal.App.3d 53, 59-60 [126 Cal.Rptr. 371].) The principal question presented here is whether the alleged conduct—the City's retention of the settlement proceeds—constitutes a prima facie showing of unreasonable or arbitrary fixing of utility rates. We conclude it does not.

■ Under organic and statutory law, *privately* owned utility companies are subject to regulation by the Public Utilities Commission (P.U.C.), a regulatory agency invested by the Legislature with the exclusive power to set utility rates which are "just and reasonable" (Cal. Const., art. XII, § 3; Pub. Util. Code, § 201 et seq., § 451; *Pacific Tel. & Tel. Co.* v. *Public Util. Com.* (1965) 62 Cal.2d 634, 647 [44 Cal.Rptr. 1, 401 P.2d 353]). In setting utility rates, the P.U.C. employs two basic factors: 1) the utility's operating expenses or cost of service and 2) a fair return on the utility's investment. (See *Southern Cal. Gas Co.* v. *Public Utilities Com.* (1979) 23 Cal.3d 470, 474 [153 Cal.Rptr. 10, 591 P.2d 34].) The P.U.C. will not allow the utility to pass unreasonable expenses on to the ratepayers. (*Pac. Tel. & Tel. Co.* v. *Public Utilities Com.* (1950) 34 Cal.2d 822, 826 [215 P.2d 441].) However, the P.U.C. requires the utility to "flow through" to the ratepayers any savings realized in the utility's cost of service. (*Southern Cal. Gas. Co.* v. *Public Utilities Com., supra,* 23 Cal.3d at pp. 475-480 [tax savings]; *Hidden Valley West* v. *SDG&E Co.* (1977) 81 Cal.P.U.C. 627.)

In contrast, *publicly* owned municipal utilities are not regulated by the P.U.C. or any other supervising agency (Cal.Const., art. XI, § 9; Gov. Code, § 39732; *City of Pasadena* v. *Railroad Commission* (1920) 183 Cal. 526, 536 [192 P. 25, 10 A.L.R. 1425]; *City & County of San Francisco* v. *Western Air Lines, Inc.* (1962) 204 Cal.App.2d 105, 131 [22 Cal.Rptr. 216], cert. den. 371 U.S. 953 [9 L.Ed.2d 502, 83 S.Ct. 502]) in the absence of a legislative grant of authority (see *County of Inyo* v. *Public Utilities Com., supra,* 26 Cal.3d 154, 166). Thus, it is the public entity itself which fixes utility rates pursuant to its

independent legislative power. (*Durant* v. *City of Beverly Hills, supra,* 39 Cal.App.2d 133, 137-138.) Unlike the P.U.C. policy which applies to privately owned utilities, there is no similar mandate that municipally owned public utilities pass along to the ratepayers any savings in its costs of providing service.

Nor do we find anything improper in the accumulation of funds for future construction of generating facilities. The city charter itself, judicially noticed below, expressly contemplates that consideration will be given in the rate-setting process to both the expense of operation and preservation of the utility's facilities and expansion in order to meet future needs.[4]

Plaintiffs place heavy reliance on *Wolgamood* v. *Village of Constantine* (1942) 302 Mich. 384 [4 N.W.2d 697], where the Michigan court found no error in the city's failure to increase the utility rates to build a reserve fund for depreciation, reasoning that a municipally owned utility had no need for such a reserve. The weight of authority, however, is to the contrary. Publicly owned utilities in general may charge rates to finance needed replacement or expansion of the utility's facilities. (See cases cited in 12 McQuillian, Municipal Corporations, § 35.37e, pp. 489-490.)

Accordingly, in the absence of a legal mandate that a municipally owned utility must pass through its cost savings, we conclude that plaintiffs have failed to allege any facts sufficient to state a cause of action for relief.

## II

█ The original purchase agreement between the City and WAPA provides in pertinent part: "That the benefits of federally generated power shall be made available at fair and reasonable terms to all of its consumers *at the lowest possible rates consistent with sound business principles.*" (Italics added.)[5] Thus, plaintiffs argue, the City breached its obligation by failing to reduce the utility rates to reflect the realized cost savings.

---

[4] The city charter requires the city manager to manage the city-owned water and power departments "in a business-like manner, charging equitable rates for the services furnished and building up the properties *so as to conserve their value and increase their capacity as needed by the city.*" (Italics added.)

The charter also requires the utility receipts to be placed in a separate utilities fund to be used, in part, for extensions and replacement of facilities.

[5] The Secretary of Interior is authorized to sell excess electrical power and energy generated at federal reservoir projects "in such a manner as to encourage the most widespread use thereof at the lowest possible rates to consumers consistent with sound business principles. . . ." (16 U.S.C. § 825s.) The contract clause is apparently one routinely inserted to assure compliance with this congressional mandate.

Plaintiffs' theory assumes that the ratepayers have standing as third party beneficiaries to enforce the agreement. The City counters that the ratepayers only incidentally benefit from the agreement and thus lack the requisite standing, but we need not reach the merits of this issue.[6] Assuming, arguendo, that plaintiffs are included in a class of intended third party beneficiaries, plaintiffs nonetheless have no valid cause of action.

As previously shown, it is not the function of the courts to evaluate the wisdom of the City's rate-fixing decisions. In that context, we cannot determine what constituted "sound business practices," but may only consider that narrower legal question whether the rates were unreasonable or arbitrarily established. For the reasons previously stated, we conclude as a matter of law that the mere refusal of the City to pass through the cost savings is not enough to demonstrate unreasonable or arbitrary fixing of rates. (*Durant* v. *City of Beverly Hills, supra,* 39 Cal.App.2d 133, 139.)[7]

### III

 Under the Santa Clara City Code the City is required to provide electricity to its residents in conformance with regulations and rates adopted by the City. Regulation 14, as enacted, provides: "The rates to be charged by and paid to the City for electric service will be rates legally in effect and on file with the City Clerk and Utilities Business Office of the City." In their petition for writ of mandate, plaintiffs alleged that the current utility rates are not "legally in effect" insofar as the rates exceed the actual cost of power. As earlier discussed, however, we reach a contrary conclusion: there is nothing improper in the City's fixing of rates to provide funds for replacement or expansion of the municipal utility's facilities in addition to the expenses of operation.

Plaintiffs further assert that the council's action on February 26, 1980, maintaining the rates at the old FCA level, did not comply with Regulation 14 since the City's resolution was not *filed* with the utility office. But plaintiffs' inconsistent claim that the challenged action did not constitute a *rate change,* together with plaintiffs' failure to attack the council's subsequent actions of August and November which perpetuated the February 26 action, renders the argument specious. Moreover, insofar as plaintiffs' argument focuses upon the *form* of

---

[6]The City raised for the first time at oral argument the contention that the purchase agreement containing the above mentioned clause has been superseded by the memorandum of understanding which contains no comparable language. Because the argument has not been briefed, we do not address it.

[7]The trial court expressed the opinion that the City's retention of funds was neither arbitrary nor unreasonable since use of customer rates provides a more attractive method of financing new facilities than municipal bonds. While plaintiffs challenge the court's authority to take judicial notice of this fact, the point is irrelevant. Whatever the validity of the reasons underlying the City's decision to retain the funds, the fact remains that the decision was neither arbitrary nor unreasonable.

the council's action—an oral motion in lieu of a written resolution—the argument is nevertheless meritless. The city charter expressly provides that an oral motion shall have the same force and effect as a written resolution. (See *City of Sausalito* v. *County of Marin* (1970) 12 Cal.App.3d 550, 556 [90 Cal.Rptr. 843] [adoption of a resolution does not require formalities of an ordinance].)[8]

## IV

Finally, plaintiffs strenuously argue they should have been allowed to amend their complaint. Plaintiffs asserted at oral argument (and in their petition for rehearing) that the settlement funds, ostensibly set aside by the city council for construction of generating facilities, are not being used for such a purpose and in fact construction is so unlikely as to be a pretext for arbitrary and bad faith conduct. Having reconsidered the merits of plaintiffs' argument following rehearing, we are persuaded that plaintiffs should be afforded an opportunity to amend.[9] (See e. g., *Minsky* v. *City of Los Angeles* (1974) 11 Cal.3d 113, 118-119 [113 Cal.Rptr. 102, 520 P.2d 726]; *Greenberg* v. *Equitable Life Assur. Society* (1973) 34 Cal.App.3d 994, 998 [110 Cal.Rptr. 470.) Of course, we made no determination as to the validity of such proposed alternate theory; our decision herein reaches only the allegations now before us: i.e., whether the City's retention of the settlement proceeds in and of itself provides a ground for relief.

The judgment is reversed with instructions to modify the order sustaining the demurrer in order to grant plaintiffs leave to file amended pleadings within 30 days of the filing of the remittitur. Each party to bear its own costs on appeal.

Newsom, J., and Goff, J.,* concurred.

A petition for a rehearing was denied January 7, 1983, and the judgment was modified to read as printed above. The petitions of appellants California Paperboard Corporation, Container Corporation of America and Siliconix, Inc., and respondents for a hearing by the Supreme Court were denied March 2, 1983.

---

[8]Plaintiffs also contend that the action taken on February 26, 1980, violated due process because the FCA question was not put on the agenda and thus the citizen-ratepayers were denied notice. Although plaintiffs have attached to their brief a copy of the city council's meeting agenda, that document is not part of the record; nor was the due process argument raised below. We therefore decline to consider the merits of such contention.

[9]We note that because of the rather peculiar procedural posture of this case plaintiffs were never given an opportunity to amend their complaint.

*Assigned by the Chairperson of the Judicial Council.