Filed 1/25/16

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| MONTEREY PENINSULA WATER MANAGEMENT DISTRICT, | ) ) ) | |
| Petitioner, | ) ) ) | S208838 |
| v. | ) ) | Cal.P.U.C. Decision Nos. |
| PUBLIC UTILITIES COMMISSION, | ) ) | 11-03-035 and 13-01-040 |
| Respondent; | ) ) ) | |
| CALIFORNIA-AMERICAN WATER CO., | ) ) | |
| Real Party in Interest. | ) ) | |

Petitioner Monterey Peninsula Water Management District, a public agency, imposed a fee on a public utility's customers for work it had undertaken to mitigate environmental damage caused by the utility. The agency's fee was charged as a line item on the utility's bill and was collected by the utility on behalf of the agency. The question before us is whether the California Public Utilities Commission (PUC or Commission), which is empowered to regulate the rates and charges of public utilities, had the authority to review the amount of the agency's fee. We conclude that the PUC did not have such authority.

## I.

The Legislature created the Monterey Peninsula Water Management District (the District) in 1977 in response to concerns that the private water

1

supplier serving the Monterey Peninsula area did not have "the ability to perform functions which are normally performed by public agencies," including, among other things, the "management and regulation of the use, reuse, reclamation, conservation of water and bond financing of public works projects." (Stats. 1977, ch. 527, § 2, p. 1672.) The Legislature conferred on the District broad powers to manage and regulate water use and distribution in the Monterey Peninsula area. (*Id.*, §§ 301-494, pp. 1686-1712.) It also gave the District the power to "levy and collect taxes and assessments upon land . . . within the district" (*id.*, § 306, p. 1686; see *id.*, §§ 501 and 701, pp. 1712 & 1723) and "[t]o fix, revise, and collect rates and charges" (*id.*, § 326, subd. (b), p. 1687). The Legislature further provided that the District may "contract that all . . . [its] charges be collected by any . . . public utility, and that such charges be billed upon the same bill [as the utility's own charges] and collected as one item." (*Id.*, § 326, subd. (d), p. 1688.)

The District operates in the same geographical region as real party in interest California-American Water Co. (Cal-Am), a privately owned public utility that supplies water to property owners in the Monterey Peninsula area. (See Cal. Const., art. XII, § 3 [defining the term "public utilities" to include "[p]rivate corporations . . . that own, operate, control, or manage a line, plant, or system for . . . the production, generation, transmission, or furnishing of heat, light, water, [or] power . . . directly or indirectly to or for the public . . . ."].) In 1995, the State Water Resources Control Board (the Water Control Board) determined that Cal-Am was diverting more water from the Carmel River than either its licenses or the common law entitled it to divert. (*Order on Four Complaints Filed Against the California-American Water Company* (July 6, 1995) Water Control Bd. Order No. WR 95-10, pp. 15-25, at <http://www.mpwmd.dst.ca.us/order9510/ Wro95-10.pdf> [as of January 25, 2016] (hereafter Order No. WR 95-10).) The Water Control Board imposed limits on Cal-Am's future use of Carmel River

2

water.  It further charged Cal-Am with responsibility for the so-called Mitigation Program, a program started by the District in 1991 as a five-year program to mitigate the environmental impacts of low streamflow in the Carmel River.  (*Id.* at pp. 30-31.)  The Water Control Board ordered Cal-Am to continue the Mitigation Program in the event the District ceased implementing the program at the end of the designated five-year term.  (*Id.* at pp. 43-44.)

The District, however, decided to continue implementing the Mitigation Program after the initial five-year period had expired.  The District also undertook a second remedial measure, the Aquifer Storage and Recovery Program, in which it pumped surplus Carmel River water into the Seaside Groundwater Basin during the winter season for retrieval during the summer season, with the aim of reducing the need for diverting Carmel River water during the summer months.  Although the Water Control Board's Order No. WR 95-10 does not expressly refer to the Aquifer Storage and Recovery Program, the parties have understood the program to fall within Cal-Am's general mitigation responsibilities under that order.

Since 1983, the District has assessed a user fee on Cal-Am customers, and it has contracted with Cal-Am to include this fee on Cal-Am's water bill.  Cal-Am collects the District's fee from Cal-Am's customers and transfers the resulting revenue to the District, which uses the revenue to fund, among other things, the two remedial programs.  The District's fee is currently set at 8.325 percent of each Cal-Am customer's water charge.

Because Cal-Am is a public utility, its rates are subject to approval by the PUC.  The PUC's powers under the California Constitution include the power to "fix rates . . . for all public utilities subject to its jurisdiction."  (Cal. Const., art. XII, § 6.)  The Public Utilities Code further specifies that "[a]ll charges demanded or received by any public utility . . . for any product or commodity furnished or to be furnished or any service rendered or to be rendered shall be just and reasonable.

3

Every unjust or unreasonable charge demanded or received for such product or commodity or service is unlawful." (Pub. Util. Code, § 451 (hereafter section 451).)

In July 2009, Cal-Am sought the PUC's approval for a rate increase in the Monterey Peninsula area. The PUC approved the rate increase, but in so doing, it raised a number of questions about the District's user fees. (See *Final Decision Authorizing Rate Increase in Monterey Water District and Toro Service Area* (2009) Cal. P.U.C. Dec. No. 09-07-021, p. 116, at <http://docs.cpuc.ca.gov/ word_pdf/FINAL_DECISION/104226.pdf> [as of January 25, 2016] (hereafter Decision No. 09-07-021).) The PUC acknowledged that "[t]he Management District has a variety of funding mechanisms at its disposal over which this Commission has no jurisdiction." (*Id.* at p. 120.) But the PUC concluded that it had authority to review the fees used to fund the mitigation programs, explaining that "[i]f the expenditures are properly Cal-Am's responsibility, we must ensure that the projects undertaken by the Management District on Cal-Am's behalf are necessary and are being provided in the most cost-effective manner." (*Ibid.*) The PUC further explained that the Cal-Am rate increase that the PUC had approved would lead to a corresponding increase in the District's percentage-based fee, but that no evidence demonstrated an increase in the District's costs or how the District planned to use the additional revenues. (*Id.* at pp. 120-121.)

The PUC determined that the record before it did "not provide sufficient legal or factual support to determine the appropriate level of Cal-Am funding" for the mitigation work. (Dec. No. 09-07-021, p. 122.) "To the extent that Cal-Am and its ratepayers are legally responsible for these programs," it continued, "we expected Cal-Am to discharge that responsibility in an efficient and effective manner either by its own actions or as a joint project with the Management District." (*Ibid.*) The PUC accordingly directed Cal-Am either to take over the

4

mitigation work itself or to "meet and confer" with the District to discuss the possibility of doing the mitigation work as a "joint project," with the District charging the cost of its services to Cal-Am (rather than to Cal-Am's customers), and with Cal-Am recovering that additional expense by way of a special "surcharge." (*Id.* at pp. 122-123.) The PUC provided that the parties could "also consider other cost effective and efficient methods for Cal-Am to fully meet any responsibility it may have" for the mitigation work. (*Id*. at p. 123.) The PUC ordered Cal-Am to file, within 180 days, "an application setting forth [a] new method of collecting funds to support [mitigation] program costs properly assignable to Cal-Am, whether performed by Cal-Am or the Management District." (*Ibid*.)

Cal-Am did not, however, file an application setting forth a "new method" of funding mitigation costs. Cal-Am instead applied to the PUC for authorization to collect the District's usual user fee and remit the collected amount to the District, as it had done in the past. Then, before the PUC responded, Cal-Am, the District, and the PUC's Division of Ratepayer Advocates moved for approval of a settlement agreement under which all moving parties agreed that the District's requested user fee was appropriate. The moving parties further argued that the PUC had no authority to regulate the charges of a public agency such as the District.

The PUC rejected both Cal-Am's application and the settlement agreement. The PUC later denied the District's application for rehearing. We granted the District's petition for a writ of review. (Pub. Util. Code, § 1756, subd. (f) ["review of [PUC] decisions pertaining solely to water corporations shall only be by petition for writ of review in the Supreme Court"].)

5

## II.

Created by the California Constitution, the Public Utilities Commission has exclusive jurisdiction to supervise and regulate public utilities. (Pub. Util. Code, §§ 701-853, 1001, 1002, 2101.) It has no authority, however, to regulate public agencies like the District, absent a statute expressly authorizing such regulation. (See *County of Inyo v. Public Utilities Com.* (1980) 26 Cal.3d 154, 166-167 (*County of Inyo*).)

The PUC has raised two arguments in support of its exercise of authority in this matter. Before this court granted a writ of review, the PUC seemed to argue that it can review the amount of any charge that appears on a public utility bill, including charges of public agencies like the District, under section 451 of the Public Utilities Code. That section provides, in pertinent part: "All charges demanded or received by any public utility . . . for any product or commodity furnished or to be furnished or any service rendered or to be rendered shall be just and reasonable." (*Ibid.*) The PUC seemed to reason that, because Cal-Am is a public utility and because the District's user fee appears on Cal-Am's bill, the user fee is a charge "demanded or received by [a] public utility," and the PUC can therefore review the fee to ensure it is "just and reasonable." (§ 451.) The logic of this argument would permit the PUC to review the amount of any third party charge that appears on a public utility bill, no matter whether the public utility originates the charge or receives the funds that are collected.

Following this court's grant of a writ of review, the PUC appeared to take a narrower approach. It conceded that it has no power to regulate a local government fee collected through a public utility's customer bills where the utility "simply act[s] as a billing and collection agent for the government entity, and it then remits the collected funds to the government entity." The PUC instead asserted that it has the power to regulate the public agency fees at issue here

6

because they are used to fund mitigation work that Cal-Am is legally obligated to perform in the event the District fails to do so.

We address these arguments in turn.

**A.**

The first, broader argument is easily disposed of: Section 451 provides no general authority for the PUC to review the amount of any and all public agency fees that are collected through a public utility's customer bills.

The argument to the contrary relies primarily on the reference to the reasonableness of "[a]ll charges demanded or received by [a] public utility." (§ 451.) Were we reading the phrase in isolation, we might plausibly read it, as the PUC initially suggested we should, to cover even public agency fees that are included on a public utility bill for remittance to the agency. But as this court has repeatedly emphasized, statutory language cannot be read in isolation; like all language, statutory language takes its meaning from the context in which it appears. (See, e.g., *People v. Leiva* (2013) 56 Cal.4th 498, 506; see also *Deal v. United States* (1993) 508 U.S. 129, 132 [it is a "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but most be drawn from the context in which it is used"].) Here, context makes clear that section 451 is not addressed to any and all third party charges that appear on a public utility's bill. Section 451 does not apply to all charges in the abstract, but to charges "for any product or commodity furnished . . . or any service rendered." This is the language of commercial exchange, not of public revenue collection. Read in context, then, section 451's reference to "charges demanded or received by [a] public utility" is most naturally understood as referring to charges for products, commodities, and services of the sort that public utilities provide, such as telecommunications, heat, light, water, and power. It is not naturally understood to encompass charges the public utility

7

demands or receives when acting merely as a billing service for a public agency. This point is confirmed by the final sentence of section 451, which provides: "All rules made by a public utility affecting or pertaining to *its* charges or service to the public shall be just and reasonable." (Italics added.) The reference to "*its* charges or service to the public" lends further support to the conclusion that section 451 is concerned with charges that originate with the public utility itself, not with the charges of public agencies or other third parties.

But even if a contrary reading of section 451 were otherwise tenable, the argument would fail because nothing in section 451 provides the PUC with the necessary "express[]" authorization to regulate the activities of public agencies like the District. (*County of Inyo*, *supra*, 26 Cal.3d at p. 166.) Indeed, section 451 does not mention the PUC at all; it simply provides that the charges of a public utility must be "just and reasonable." The PUC's authority to enforce the "just and reasonable" standard with respect to public utilities is not rooted in section 451, but instead derives from the Commission's constitutional power to fix the rates of public utilities (Cal. Const., art. XII, § 6). But the California Constitution confers on the PUC no comparable power to regulate fees and taxes assessed by public agencies. Section 451 cannot fill that gap. To read the statute's prescription of a "just and reasonable" standard for reviewing the rates of public utilities as a general grant of authority to review the amounts of any and all municipal and other governmental fees and taxes that appear on a utility's customer bills would dramatically expand the Commission's powers in a manner the Legislature could not have intended.[1]

---

[1]     Significantly, the language that now appears in section 451 was first enacted in 1915. (Stats. 1915, ch. 91, § 13, p. 122.) When, some 62 years later, the Legislature created the District and gave it the power to enter contracts to have

*(footnote continued on next page)*

8

**B.**

We thus turn to the PUC's narrower argument, which it emphasized in a supplemental answer filed after we granted review in this matter. In that filing, the PUC expressly concedes that it lacks authority to review the amount of a local government fee collected through a public utility's customer bills, at least where the utility "simply act[s] as a billing and collection agent for the government entity, and it then remits the collected funds to the government entity." It would, however, distinguish such a "Government Fee" from what it terms a "Utility Surcharge" — that is, a special charge "collected by a utility as part of its revenue requirement" that may either be "retained by the utility[] or remitted in whole or in part to another entity for services it performs on the utility's behalf." The PUC reasons that it has authority to regulate a utility surcharge in the same manner as any other utility charge because, like other utility charges, a utility surcharge relates to the utility's own operational costs.

The PUC contends that its decision in this matter should be upheld because it did not "rule on the District's ability to impose a Government Fee," nor did it "direct[] the District or Cal-Am to cease to collect a Government Fee." Rather, "concerned that a Government Fee imposed by the District might not be the most efficient and effective method of funding programs that are Cal-Am's responsibility," the PUC "directed Cal-Am to confer with the District and propose a possible alternative for funding program costs," such as by way of a utility surcharge. The PUC argues that it therefore properly treated Cal-Am's subsequent

*(footnote continued from previous page)*

its charges included on public utility bills, the Legislature gave no hint that District charges so collected would somehow be subject to section 451 review. (See Stats. 1977, ch. 527, § 326, subd. (d), p. 1688.)

9

application to continue collecting the mitigation fees as a request to impose a utility surcharge, rather than a government fee, and rejected the application on that basis.**2**

Given the record before us, this argument fares no better than the broad argument that the PUC has general authority to regulate the District's user fee merely because it appeared on a public utility's customer bill. As the PUC itself has previously recognized, the user fee at issue originated with the District, not Cal-Am. (*In the Matter of the Application of California-American Water Company for an Order Authorizing the Collection and Remittance of the Monterey Peninsula Water Management District User Fee* (2010) Cal. P.U.C. Dec. No. 13-01-040, p. 20, at <http://docs.cpuc.ca.gov/PublishedDocs/Published/ G000/M040/K647/40647695.pdf> [as of January 25, 2016] ["We clearly understood that distinction [between a Cal-Am charge and a District charge] as evidenced by our statement that *Cal-Am would merely collect* [*the*] *fee for the District, but that it is the District which originates the charge.* [Citation.]" (Italics added.)].) The PUC argues, however, that because the District is doing mitigation work that Cal-Am is legally obligated to perform, the District is not acting on its own behalf, but as Cal-Am's agent. The PUC reasons that the fee that the District imposes on Cal-Am's customers should therefore be treated as if it were Cal-Am's

---

**2** The PUC subsequently approved mitigation work funding that the parties structured as a utility surcharge — that is, the PUC approved charges that Cal-Am requested for its own account to cover the cost to Cal-Am of paying the District, under the terms of a written agreement, for mitigation work the District did on Cal-Am's behalf. (See *In the Matter of the Application of California-American Water Company for an Order Authorizing the Collection and Remittance of the Monterey Peninsula Water Management District User Fee* (2012) Cal. P.U.C. Dec. No. 12-06-020, pp. 7-8, 11, at <http://docs.cpuc.ca.gov/PublishedDocs/ WORD_PDF/FINAL_DECISION/169628.pdf> [as of January 25, 2016].)

10

own fee.  The PUC never made such a finding, however, and we discern no basis in the record for reaching the conclusion that the District has been acting as Cal-Am's agent in engaging in the mitigation work at issue.  Indeed, under the Water Control Board's Order No. WR 95-10, Cal-Am's legal obligation to do the mitigation work is contingent on the District ceasing to do that work; because the District has not ceased to do that work, Cal-Am has no present obligation to perform the work at issue.  The District is a public agency charged by statute with the task of managing water resources in the Monterey Peninsula area, including the conservation of ground and surface water and the protection of the environment.  The District therefore has an independent interest in the mitigation work.  The fact that the District's work also fulfills Cal-Am's legal obligation, without more, does not establish that the District is acting as Cal-Am's agent.  The PUC has thus failed to identify any sound basis for exercising authority over the fee at issue in this case.

We acknowledge the PUC's concerns about whether the increase in the amount of the user fee, which results automatically from an increase in Cal-Am's rates, corresponds to the value of the mitigation work the District is performing. We express no view on the merits of this issue.  We do, however, emphasize that PUC regulation is not the only mechanism for addressing questions about the amount of the user fee or the efficiency of the District's mitigation work.  If Cal-Am customers believe that the District is charging excessive and disproportionate fees, they can bring a legal action challenging the District's activities.  (See, e.g., *California Farm Bureau Federation v. State Water Resources Control Bd.* (2011) 51 Cal.4th 421; *Moore v. City of Lemon Grove* (2015) 237 Cal.App.4th 363.)  And if customers are concerned that the District is managed inefficiently, they can elect new leadership to the District's managing board.  (Stats. 1977, ch. 527, § 203, p. 1682 [five out of seven board members directly elected by voters within

11

district].)  Whatever concerns the PUC may have about the adequacy of these existing checks on the District's activities, those concerns do not justify expanding the PUC's jurisdiction beyond the limits fixed by law.

We accordingly set aside the decisions before us on review and remand the matter to the PUC for reconsideration.  On remand, the PUC should distinguish between agency-originated charges and utility-originated charges, and it may not treat an agency-originated charge as a utility surcharge merely because the agency is performing work that fulfills a utility's legal responsibility.

## III.

PUC Decision No. 11-03-035 (rejecting Cal-Am's application for authorization to collect the District's user fee, and also rejecting the settlement agreement entered into by Cal-Am, the District, and the Division of Ratepayer Advocates) and PUC Decision No. 13-01-040 (denying the District's application for rehearing) are set aside.  The matter is remanded to the PUC for further proceedings consistent with the views expressed herein.


**KRUGER, J.**


**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**

12

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Monterey Peninsula Water Management District v. California PUC

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding** XXX
**Review Granted**
**Rehearing Granted**


_____

**Opinion No.** S208838
**Date Filed:** January 25, 2016

_____

**Court:**
**County:**
**Judge:**


_____

**Counsel:**

DeLay & Laredo, David C. Laredo; Goodin, MacBride, Squeri, Day & Lamprey, Thomas J. MacBride, Jr., Suzy Hong and Megan Somogyi for Petitioner.

Frank R. Lindh, Helen W. Yee and Pamela Nataloni for Respondent.

Timothy J. Miller; Manatt, Phelps & Phillips, Benjamin G. Shatz and Lori Anne Dolqueist for Real Party in Interest.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Thomas J. MacBride, Jr.
Goodin, MacBride, Squeri, Day & Lamprey
505 Sansome Street, Suite 900
San Francisco, CA  94111
(415) 392-7900

Pamela Nataloni
505 Van Ness Avenue
San Francisco, CA  94102
(415) 703-4132